Slip Op. 24-97

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNITED STATES,<br><br>   Plaintiff,<br><br> v.<br><br>KOEHLER OBERKIRCH GMBH, f/k/a PAPIERFABRIK AUGUST KOEHLER SE, f/k/a PAPIERFABRIK AUGUST KOEHLER AG; and KOEHLER PAPER SE,<br><br>   Defendants. | Before: Gary S. Katzmann, Judge<br>Court No. 24-00014 |

### OPINION AND ORDER

[ The court grants Plaintiff's Motion for Alternative Service on Defendants.]

Dated: <u>August 21, 2024</u>

<u>Luke Mathers</u>, Trial Attorney, U.S. Department of Justice, New York, N.Y, argued for Plaintiff United States.  With him on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Field Office, and <u>Edward F. Kenny</u>, Senior Trial Counsel.  Of counsel were <u>Sasha Khrebtukova</u>, Attorney, and <u>Brandon T. Rogers</u>, Senior Attorney, Offices of the Assistant Chief Counsel, U.S. Customs and Border Protection, of New York, N.Y. and Indianapolis, IN.

<u>John F. Wood</u>, Holland & Knight LLP, of Washington, D.C., argued for Defendants Koehler Oberkirch GmbH and Koehler Paper SE.  With him on the briefs were <u>Andrew McAllister</u>, <u>Anna P. Hayes</u>, and <u>Stuart G. Nash</u>.

  Katzmann, Judge:  Defendants Koehler Oberkirch GmbH ("Koehler GmbH") and Koehler

Paper SE ("Koehler SE") (collectively, "Koehler" or "Defendants") are German manufacturers of

lightweight thermal paper[1] that allegedly owe about $200 million in unpaid antidumping duties

---

[1] Lightweight thermal paper is paper of a certain weight that "form[s] an image when heat is applied," and is "typically (but not exclusively) used in point-of-sale applications such as ATM receipts, credit card receipts, gas pump receipts, and retail store receipts."  <u>Antidumping Duty</u>

and interest to the United States.  See Papierfabrik August Koehler SE v. United States, 843 F.3d

1373 (Fed. Cir. 2016).  The United States ("the Government") brought this action to recover that

sum, filing a summons and a complaint with the U.S. Court of International Trade ("USCIT") on

January 24, 2024.  See Summons, Jan. 24, 2024, ECF No. 1; Compl., Jan. 24, 2024, ECF No. 2;

see also Am. Compl., Feb 8, 2024, ECF No. 4; USCIT R. 3(a).[2]

    Before this litigation can proceed further, the Government must serve copies of the

Summons and Amended Complaint on both defendants.  See USCIT R. 4(b)(1).  In the motion

now before the court, the Government requests that the court order service through Koehler's U.S.-

located counsel, arguing that this method of service constitutes "means not prohibited by

international agreement" and is in accordance with federal law.  USCIT R. 4(e)(3).  Koehler

opposes this request, insisting that the Government instead effect service through the issuance of

diplomatic letters rogatory to the government of Germany.

    Because USCIT Rule 4(e) is the relevant provision, and because the Government's

proposed service on Koehler through its U.S. counsel would accord with that provision—violating

neither international agreement nor federal law—the court grants the Government's motion.

## BACKGROUND

    To fully unspool the sixteen-year history of the administrative proceedings underlying this

case would make this opinion even more of a paper-intensive endeavor than its subject matter

demands.  The court instead sets forth only the facts necessary to explain how Koehler came to

---

Orders: Lightweight Thermal Paper from Germany and the People's Republic of China, 73 Fed.
Reg. 70959, 70960 (Dep't Com. Nov. 24, 2008) ("Antidumping Duty Orders").

[2] "The Rules of the United States Court of International Trade, necessary to implement the
Customs Court Acts of 1980, are styled, numbered and arranged to the maximum extent
practicable in conformity with the Federal Rules of Civil Procedure[]."  Preface, USCIT Rules.

owe about $200 million to the United States.

The U.S. Department of Commerce ("Commerce") imposed an antidumping duty order on lightweight thermal paper from Germany in 2008. See Antidumping Duty Orders, 73 Fed. Reg. 70959. Koehler's U.S. imports of lightweight thermal paper were subject to that order from its imposition to its revocation in 2013. See id. at 70960; Lightweight Thermal Paper from the People's Republic of China and Germany: Continuation of the Antidumping and Countervailing Duty Orders on the People's Republic of China, Revocation of the Antidumping Duty Order on Germany, 80 Fed. Reg. 5083 (Dep't Com. Jan. 30, 2015).

During Commerce's third administrative review of the antidumping duty order, which took place from 2011 to 2013, Commerce discovered that Koehler had engaged in a "deliberate scheme to conceal home market sales and manipulate home market price data . . . ." Mem. from C. Marsh to P. Piquado, re: Issues and Decision Memorandum at 7, Case No. A-428-840, Bar Code: 3129807-01 (Dep't Com. Apr. 11, 2013). Commerce solicited information from Koehler regarding its home-market sales of lightweight thermal paper, but "Koehler intentionally provided incomplete and inaccurate information in response to the Department's detailed and very specific . . . questionnaire" and "continued to misrepresent its home market sales reporting in response to . . . supplemental questionnaires that included specific questions concerning home market sales." Id. at 10. On account of this misrepresentation Commerce made an adverse inference that resulted in the assignment of a 75.36% *ad valorem* antidumping duty rate to Koehler's imports of subject merchandise from November 1, 2010 to October 31, 2011. See id. at 17–18; Lightweight Thermal Paper from Germany: Final Results of Antidumping Duty Administrative Review; 2010–2011, 78

Fed. Reg. 23220, 23221 (Dep't Com. Apr. 18, 2013).[3]  Then, following the Government's voluntary remand request in litigation pertaining to the second administrative review (covering the period between 2009 to 2010), Commerce applied the same 75.36% dumping margin to Koehler's imports during that period as well.  See Final Remand Redetermination Pursuant to Court Remand Order at 52–53, Papierfabrik August Koehler AG v. United States, No. 12-00091 (CIT filed June 16, 2014), ECF No. 76, Bar Code: 3210702-01.

Koehler challenged both applications of the 75.36% dumping margin in a pair of actions before this court, from which ensued appeals to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"), and petitions for writs of certiorari from the U.S. Supreme Court.  See Papierfabrik August Koehler AG v. United States, 40 CIT 983, 180 F. Supp. 3d 1211 (2016), aff'd sub nom. Papierfabrik August Koehler SE v. United States, 710 F. App'x 889 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1290 (2019); Papierfabrik August Koehler SE v. United States, 38 CIT 1239, 7 F. Supp. 3d 1304 (2014), aff'd, 843 F.3d 1373, cert. denied, 583 U.S. 1038 (2017).  None of these challenges were successful, and the 75.36% margin's applicability to Koehler's imports of lightweight thermal paper from November 2009 through October 2011 is now final.  See 19 U.S.C. § 1514(a); Notice of Lifting of Suspension, Case No. A-428-840, Bar Code: 3806295-01 (Dep't Com. Mar. 15, 2019).

The amount of Koehler's antidumping duty liability consequently exceeded the amount of Koehler's cash deposits, which were premised on estimated 3.77% and 6.50% dumping margins, to a considerable degree.  The Government alleges that Koehler's unpaid antidumping duties

---

[3] For a lengthier summary of this administrative proceeding, see Papierfabrik August Koehler SE, 843 F.3d at 1375–77.

amount to $145,288,597.04, and that the pre-liquidation interest on these unpaid duties amounts to $48,343,045.04.  Am. Compl. ¶ 24 (citing 19 U.S.C. § 1677g).  The sum of these figures—allegedly a total of $193,631,642.08 at the time of this action's commencement—does not include post-liquidation interest that accrues each month on the unpaid duties.  Id. ¶ 26 (citing 19 U.S.C. § 1505(d)).  The Government seeks Koehler's payment of this post-liquidation interest as well.  Id.

The Government brought this action to recover the unpaid duties and interest, alleging that Koehler is engaged in a scheme (separate from the home-market price manipulation scheme noted above) to avoid payment and defraud Customs through the transfer of assets between related corporate entities.  Am. Compl. ¶¶ 29–53.  The Government claims that the entity that incurred the antidumping liability—Koehler GmbH, which in turn changed its name from Papierfabrik August Koehler SE in 2021, id. ¶¶ 4–5, transferred assets and liabilities to a new entity, Koehler SE, fewer than nine months after Customs's assessment of Koehler GmbH's antidumping duty liability became final.  Id. ¶ 29.  At the time of the transfer, Koehler GmbH and Koehler SE allegedly had the same corporate address and the same slate of officers and directors.  Id. ¶¶ 30–31.  According to the Government, "[a]t the end of the FY 2021, Koehler [GmbH]'s assets had been reduced to . . . less than a quarter of what they were at the close of the prior fiscal year before the 'spin-off.'" Id. ¶ 36.

After initiating this action, the Government unsuccessfully attempted to serve Koehler with copies of the Summons and Complaint under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. 6638 [hereinafter

Hague Convention],[4] to which the United States and Germany are both signatories.   The

Government sent a request for Hague Convention service with a German district court in Freiburg

im Breisgau, Baden-Württemberg (the German state where Koehler's Oberkirch headquarters are

located), but that court concluded in a pair of identically-worded letters (dated March 13, 2024)

that "[t]his matter concerns claims under public law and is not a civil or commercial matter" and

that "[t]he Hague Service Convention is therefore not applicable to the servicing of the

documents."  Gov't Br. Ex. B at 2, 5, Apr. 22, 2024, ECF No. 7-2.  Instead, the German court

"request[ed] that a request should be made through diplomatic channels, so that the relevant

administrative authorities can take action if necessary."  Id. (emphasis in original).

       While the Hague Convention request remained pending, the Government attempted to

serve Koehler through Steptoe LLP, a law firm whose Washington, DC-based counsel actively

represent both Koehler GmbH and Koehler SE in separate ongoing litigation pertaining to a

different antidumping duty order on thermal paper from Germany.  See Matra Ams., LLC v. United

States, No. 21-00063 (CIT filed Dec. 22, 2021).  The Government sent an email inquiry on January

24, 2024, to which counsel from Steptoe responded as follows (on March 12, 2024):

> As I previously indicated, Steptoe does not represent the defendants in this action
> and that remains so.   Nonetheless, I would expect that the defendants would be
> interested in attempting to resolve this matter amicably with the U.S., without
> litigation.  Toward that end, I would expect that the defendants would be willing to
> appoint counsel (not Steptoe) for this matter for the purpose of attempting to
> negotiate a settlement, provided that the U.S. agreed that by doing so the defendants
> are not consenting to service of process and are not waiving any objections to

---

[4] The Hague Convention is a multilateral treaty whose "purpose . . . is to simplify, standardize, and generally improve the process of serving documents abroad."  Water Splash, Inc. v. Menon, 581 U.S. 271, 273 (2017).  Its first Article provides that "[t]he present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad."  Hague Convention, supra, at art. 1.

> service, and that the U.S. will not attempt to effectuate service through that counsel. Please let me know whether you will agree to these terms and I will pass it on.

Gov't Br. Ex. C at 2–3, Apr. 22, 2024, ECF No. 7-3. The Government emailed the following reply the following day:

> We are open to considering a reasonable settlement proposal from the defendants. As we are in the process of serving the defendants pursuant to the Hague Convention, we don't currently have any reason to attempt service through alternative means; however, we can agree to those terms (i.e., that the defendants are not consenting to, nor waiving any objections to, service by negotiating, and are not authorizing their U.S. counsel to accept service; and that we will not to attempt to effect service on such counsel unless authorized).

Id. at 2. About thirty minutes later, counsel from Steptoe replied in turn: "Thanks. Message received and passed on. Tapping out here." Id.

It appears that after this exchange, and after the Government's receipt of the German court's letters, the Government made no further attempt to serve Koehler with the voluntary cooperation of either the German government or U.S.-based counsel. The Government instead proceeded to seek a judicial order from the U.S. Court of International Trade.

The Government filed the instant motion for alternative service on April 22, 2024, seeking "an order authorizing the Government to effect service on defendants . . . through their U.S. counsel of record" in the Matra litigation (Steptoe). Gov't Br. at 1, Apr. 22, 2024, ECF No. 7. Koehler was unrepresented in this case at the time the Government filed this motion, and remained unrepresented for three weeks. But on May 13, 2024, Washington, DC-based counsel from Holland & Knight, LLP entered notices of appearance on behalf of all defendants. See Form 11 Notice of Appearance, May 13, 2024, ECF No. 9; Form 11 Notice of Appearance, May 13, 2024, ECF No. 10; Form 11 Notice of Appearance, May 13, 2024, ECF No. 13; Form 11 Notice of Appearance, May 13, 2024, ECF No. 14 (collectively, the "Form 11 Notices"). Koehler concurrently filed a response in opposition to the Government's motion, see Defs.' Resp. in Opp'n

to Mot. for Alternative Service, May 13, 2024, ECF No. 11 ("Defs.' Br."), and moved for oral

argument.  <u>See</u> Mot. for Oral Arg., May 13, 2024, ECF No. 12.  The court granted this motion for

oral argument and ordered the Government to file a reply in further support of its motion for

alternative service.  <u>See</u> Order, May 14, 2024, ECF No. 14.  The Government timely complied.

<u>See</u> Reply in Support of Pl.'s Mot. for Alternative Service, May 28, 2024, ECF No. 17 ("Gov't

Reply").  In its reply, the Government broadened its request for service on Koehler through U.S.

counsel to include Holland & Knight.  <u>See</u> <u>id.</u> at 9.  Oral argument took place on June 25, 2024,

after which the parties filed post-argument submissions at the court's request.  <u>See</u> Pl.'s Post-Oral

Arg. Br., July 1, 2024, ECF No. 24; Defs.' Post-Oral Arg. Br., July 3, 2024, ECF No. 25.

## DISCUSSION

This action lies under 28 U.S.C. § 1582(3), which vests the U.S. Court of International

Trade with exclusive jurisdiction over "any civil action which arises out of an import transaction

and which is commenced by the United States . . . to recover customs duties."

The sole issue before the court is how the Government may serve copies of the Summons

and Amended Complaint on Koehler GmbH and Koehler SE.  Rule 4(e) of the U.S. Court of

International Trade, which pertains to "Serving an Individual in a Foreign Country,"[5] provides as

follows:

> Unless federal law provides otherwise, an individual—other than a minor, an
> incompetent person, or a person whose waiver has been filed—may be served at a
> place not within any judicial district of the United States:

---

[5] USCIT Rule 4(g) provides that service on a corporation "at a place not within any judicial district
of the United States" must be effected "in any manner prescribed by Rule 4(e) for serving an
individual, except personal delivery under (e)(2)(C)(i)."  USCIT R. 4(g)(2).

(1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means by a method that is reasonably calculated to give notice:

    (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction; or

    (B) as the foreign authority directs in response to a letter rogatory or letter of request; or

    (C) unless prohibited by the foreign country's law, by

        (i) delivering a copy of the summons and of the complaint to the individual personally; or

        (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

USCIT R. 4(e).  The Government seeks to invoke subdivision (3), which it asserts "was built for these circumstances," Gov't Br. at 10, and asks the court to order service on Koehler either through Koehler's U.S.-located counsel or through email.  Other means of service, according to the Government, would constitute "time-consuming" and "unnecessary" processes.[6]  Id.

---

[6] Nothing in USCIT Rule 4(e)'s text requires a plaintiff to exhaust, or establish the futility of exhausting, the procedures enumerated in subdivisions (1) and (2) before it may properly request a court order pursuant to subdivision (3).  But USCIT Rule 4(e) does facially require a plaintiff to establish that its proposed court-ordered means of service would not contravene "federal law," and that those means would not be "prohibited by international agreement."  Id.  And because the Hague Convention is an "international agreement" which by its terms "shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad," Hague Convention, supra, at art. 1, USCIT Rule 4(e)(3)'s "by other means not prohibited by international agreement" language effectively imports an exhaustion requirement with respect to Hague Convention service.

    As explained below, however, the German court's conclusion that the Hague Convention does not apply in this matter obviates this quasi-exhaustion requirement.  See infra Section IV.

Koehler opposes the Government's request on two grounds. First, Koehler argues that USCIT Rule 4(e) does not permit service on a foreign defendant through its U.S. counsel because "Serving an Individual in a Foreign Country" refers to the place of service—and that service through Koehler's U.S. counsel would take place in the United States. Defs.' Resp. at 3–4. Second, Koehler argues that as a matter of international comity and "due process principles," alternative service under USCIT Rule 4(e)(3) is improper until the Government first exhausts the "diplomatic channels" referenced by the German court in Baden-Württemberg. Id. at 4.

For the reasons explained below, the court holds that USCIT Rule 4(e) permits service on a foreign-located defendant through its U.S.-located counsel, and concludes that under the circumstances of this case, international comity and due process considerations do not preclude service through Koehler's particular U.S.-located counsel. The court also concludes that the Government has carried its burden, under USCIT Rule 4(e), of showing that its proposed means of service on Koehler would contravene neither federal law nor international agreement.

## I.    USCIT Rule 4(e) Applies to Service on a Foreign Defendant Through U.S. Counsel

Although Koehler (both GmbH and SE) is incorporated and headquartered in Germany, the Government's proposed conduit for service under Rule 4(e)(3) is counsel located in the United States. This raises a matter of first impression in the U.S. Court of International Trade, which is whether the scope of "Serving an Individual in a Foreign Country" includes service on a foreign defendant through U.S.-located counsel. USCIT R. 4(e). This is a matter on which other federal courts, applying the identically-worded Rule 4(f) of the Federal Rules of Civil Procedure ("FRCP"), are not unanimous. Two opinions by the U.S. District Court for the Southern District

of New York illustrate the main point of disagreement—and prove, through their patent reasonableness, that FRCP Rule 4(f)'s scope is a matter on which reasonable minds can disagree.

In Convergen Energy LLC v. Brooks, the district court reasoned that by their "plain language," FRCP Rules 4(e) and 4(f)[7] "speak not to whether the individual to be served is located or resides outside of the United States but to where the individual 'may be served' or the 'place' where service is to be made." 2020 WL 4038353, at *8 (S.D.N.Y. 2020). This language, the district court held, "does not permit the Court to order alternative service at a place outside any judicial district of the United States when the service would be made in a judicial district of the United States." Id. at *9.[8] This, in Convergen, precluded service on the defendant through its counsel in New York City. Id.

In United States v. Mrvic, the district court diverged in part from the Convergen approach. 652 F. Supp. 3d 409, 413 (S.D.N.Y. 2023). Although the district court did not reject Convergen's premise that FRCP Rule 4(f)(3) permits service only "at a place not within any jurisdiction of the United States," it held that the provision nevertheless "permits service through U.S. counsel, because 'the relevant circumstance is where the defendant is, and not the location of the

---

[7] These subdivisions correspond to subdivisions (d) and (e), respectively, of USCIT Rule 4. "USCIT Rule 4 is substantially identical to Federal Rule of Civil Procedure 4; therefore, the court may consider decisions and commentary on Federal Rule of Civil Procedure 4 for guidance." United States v. Zatkova, 35 CIT 1059, 1061 n.1 (2011).

[8] The underlying reason for this, as explained by the district court in Convergen, is that FRCP Rule 4(f) ("Serving an Individual in a Foreign Country") "operates as a counterpart to [FRCP Rule] 4(e), which is entitled 'Serving an Individual Within a Judicial District of the United States,' and sets forth the rules by which service can be effected in a judicial district of the United States." Id. at *3. No federal court appears to dispute that the two provisions, taken together, fill out the universe of possible locations of service.

Court No. 24-00014                                                                                      Page 12

intermediary.'" Id. (collecting cases) (quoting Wash. State Inv. Bd. v. Odebrecht, S.A., 2018 WL

6253877, at *4 (S.D.N.Y. 2018)).

The court follows Mrvic, which appears to represent the majority view among the federal

judiciary,[9] in parsing the heading of USCIT Rule 4(e).  Even though "Serving an Individual in a

Foreign Country" refers to the place of service and not the identity of the defendant, service on a

foreign defendant through U.S.-located counsel is generally an act that takes place in a foreign

country.  This is because service through U.S. counsel is not service on U.S. counsel: the recipient

of service is the defendant,[10] and the defendant receives the summons and complaint from its U.S.

counsel wherever the defendant is located.  See Freedom Watch, Inc. v. Org. of the Petroleum Exp.

Countries, 766 F.3d 74, 84 (D.C. Cir. 2014) ("[W]hen a court orders service on a foreign entity

through its counsel in the United States, the attorney functions as a mechanism to transmit the

service to its intended recipient abroad.").

Delivering the summons and complaint to a defendant's U.S. counsel may alone suffice to

satisfy the due process requirement of "notice reasonably calculated, under all the circumstances,

---

[9] The Government contends that Convergen "represents the minority position within the federal
judiciary," see Pl.'s Post-Oral Arg. Br. at 1, and that Mrvic represents the view of "most courts".
Gov't Br. at 6.  While this appears to be accurate, see Bazarian Int'l Fin. Assocs., L.L.C. v.
Desarrollos Aerohotelco, C.A., 168 F. Supp. 3d 1, 15 (D.D.C. 2016) (collecting cases), the court
pays no heed to Mrvic's seeming "majority" status in adopting that case's reading of FRCP Rule
4(f).  Nor does any Federal Circuit precedent compel the court's holding on this question.  See In
re OnePlus Tech. (Shenzhen) Co., Ltd., 2021 WL 4130643, at *3 (Fed. Cir. 2021) (declining to
disturb the United States District Court for the Western District of Texas's Mrvic-like
interpretation of Federal Rule 4(f)(3), under a highly deferential "clear and indisputable" standard,
in ruling on a mandamus petition in a patent infringement case).

[10] The text of USCIT Rule 4 makes this clear.  It refers, for example, to a "domestic or foreign
corporation, or a partnership or other unincorporated association that is subject to suit under a
common name, [that] must be served."  USCIT R. 4(g).

to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950). But whatever the reasonableness of this calculation, service does not actually occur until the defendant receives the required documents. The location of U.S. counsel is no more the place of service than a last-mile distribution center is the destination of a package. See Spin Master, Ltd. v. Aomore-US, 2024 WL 3030405, at *7 (S.D.N.Y. June 17, 2024) ("Put another way, [FRCP] Rule 4(f) permits a method of service that entails transmitting documents through U.S. counsel, but only if service is ultimately completed abroad." (emphasis in original)).

Because Koehler is a corporation that is based in Germany, Germany is in all likelihood where Koehler will receive service of process. It is accordingly USCIT Rule 4(e) ("Serving an Individual in a Foreign Country"), and not 4(d) (whose heading is "Serving an Individual Within a Judicial District of the United States"), which governs the court's consideration of the Government's proposed method of service in this case.

## II. International Comity Does Not Preclude Service Through Koehler's U.S. Counsel

Koehler argues that service through any means other than the "diplomatic channels"[11] referenced by the German court in Freiburg im Breisgau "would violate principles of international

---

[11] The Government argues that Koehler conflates "Diplomatic channels" with "diplomacy," and quotes a statement on the U.S. Department of State's website that defines "diplomatic channels" as "a formal system of communication between governments . . . used to transmit letters rogatory to a foreign government so that they may be directed to the appropriate foreign court." Gov't Reply at 6 n.1. The court is unpersuaded that "diplomatic channels" necessarily refers to a category as narrow as the formal transmission of letters rogatory, and recognizes that this question's resolution would ultimately depend on the proper construal of the German term "*diplomatischem Wege*." Gov't Br. Ex. B at 4. For the reasons explained below, however, even a maximally broad construal of this term would not compel a conclusion that the German government has issued a categorical objection to all forms of non-letters rogatory service in this case.

comity, which requires that foreign and public international law be given effect in U.S. courts."
Defs.' Resp. at 4.

Even though USCIT Rule 4(e) facially requires compliance only with U.S. federal law and international agreement—and not with foreign law—the comity principles cited by Koehler are not toothless. "American courts should," after all, "take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa, 482 U.S. 522, 546 (1987). The Advisory Committee Note to (Federal) Rule 4(f)(3) states that "an earnest effort should be made to devise a method of communication that is consistent with due process and minimizes offense to foreign law." Fed. R. Civ. P. 4 advisory committee's note to 1993 amendment. And international comity does sometimes favor channeling service on a foreign defendant through the issuance of letters rogatory. In Tucker v. Interarms, a case that Koehler highlights, the district court cited "principles of comity" as the basis for its insistence that the plaintiff "follow Brazilian law and obtain letters rogatory to ensure service of process." 186 F.R.D. 450, 452 (N.D. Ohio 1999).

International comity does not compel a similar insistence here. Koehler's representations do not establish a German sovereign interest to which comity might conceivably be owed. Koehler cites no provision of German law that, like the Brazilian law referenced in Tucker, would as a general matter require that "service of process by a foreign party upon a party domiciled in [Germany] . . . be made by means of letters rogatory". Id. (quoting Alpha Omega Tech., Inc. v. PGM - Comercio E Participacoes Ltda., 1994 WL 37787, at *1 (S.D.N.Y. 1994)). Indeed, another district court has found that Germany, as of 2009, "has not expressly forbidden numerous other

potential avenues to insure that a defendant is aware of the allegations against it." In re S. African

Apartheid Litig., 643 F. Supp. 2d 423, 437 (S.D.N.Y. 2009).

Nor do the statements by the German district court in Freiburg im Breisgau evince a

German sovereign interest in Koehler's avoidance of alternative service. The (translated)

documents issued by that court read in their entirety as follows:

> Dear Sirs, dear Madams,
> I am returning the above request for service without addressing it.
> Completion under the Hague Service Convention is out of the question, as the
> present proceedings are not a civil or commercial matter.
> The plaintiff in the present case is the United States of America. In the proceedings,
> the plaintiff is demanding payment of anti-dumping duties in the amount of over
> USD 193,000,000.00.
> This matter concerns claims under public law and is not a civil or commercial
> matter.
> The Hague Service Convention is therefore not applicable to the servicing of the
> documents.
> The execution of the requested service was therefore to be denied.
> I therefore request that a request should be made through diplomatic channels, so
> that the relevant administrative authorities can take action if necessary.
> With the highest regards
> [Signature]

Gov't Br. Ex. B at 2 (emphasis in original). Even through the mists of translation,[12] the court does

not read this as a statement requiring that diplomatic channels form the U.S. Government's

exclusive means of serving Koehler. Instead, the German court's request-for-a-request through

diplomatic channels is tied to a specific rejection of the U.S. Government's requests for service

under the Hague Convention. Most of the text of the German court's letters is devoted to

explaining why Hague Convention service is inapplicable—which is apparently because this case

---

[12] No party disputes the accuracy of this translation.

is not "a civil or commercial matter" as defined[13] by German law.  Id.; see also Hague Convention,

supra, at 362.  The letters then conclude by framing "diplomatic channels" as an alternative to

Hague Convention service: "The execution of the requested service was therefore to be denied.  I

therefore request that a request should be made through diplomatic channels."  Gov't Br. Ex. B at

2 (emphasis in original).  This series of statements directs the U.S. Government, to the extent it

seeks the German government's assistance with serving Koehler, to obtain that assistance through

diplomatic means.  It does not suggest that without such assistance, Koehler cannot be served.

Invoking the persuasive force of international comity requires a stronger showing of a

foreign sovereign interest than what Koehler has made here.  If "due respect" for Germany's

"sovereign interest" thwarted the operation of USCIT Rule 4(e)(3) in this case, it would be hard to

imagine when the court's exercise of discretion to order alternative service under Rule 4(e)(3)

might ever be proper.  Aérospatiale, 482 U.S. at 546.  Such vestigiality would distort Rule 4's

structure, wherein "[FRCP] Rule 4(f)(3) is not subsumed within or in any way dominated by

[FRCP] Rule 4(f)'s other subsections; it stands independently, on equal footing."  OnePlus, 2021

WL 4130643, at *3 (quoting Nuance Commc'ns, Inc. v. Abbyy Software House, 626 F.3d 1222,

1239 (Fed. Cir. 2010)); see also Wright & Miller, 4B Fed. Prac. & Proc. Civ. § 1134 (4th ed. 2024)

("[FRCP R. 4(f)(3)] may be used for example . . . when the Central Authority of the foreign country

has refused to serve a particular complaint (perhaps based on its own public policy or substantive

---

[13] It appears that at least some German courts, upon concluding that a matter involves a claim for
punitive damages, do not consider the matter to be "civil or commercial" in nature.  See United
States ex rel. Bunk v. Birkart Globistics GmbH & Co., 2010 WL 423247, at *2–3 (E.D. Va. 2010).
The German court in this case did not expressly state this proposition in its letters to the
Government in this case.  But its reliance thereon might be inferred from the statement that "[i]n
the proceedings, the plaintiff is demanding payment of anti-dumping duties in the amount of over
USD 193,000,000.00."  Gov't Br. Ex. B at 2.

law limitations) . . . .").  The court accordingly concludes that alternative service pursuant to

USCIT Rule 4(e)(3) would not offend international comity in this case.[14]

### III.    Service Through U.S. Counsel Would not Deprive Koehler of Due Process

The court next must ensure compliance with USCIT R. 4(e)'s general requirement that

service in a foreign country not contravene "federal law."  Id.  This, for present purposes, means

ensuring that the Government's proposed means of service would satisfy the (U.S.) constitutional

requirement of providing "notice reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their

objections."  Mullane, 339 U.S. at 314; see also Volkswagenwerk Aktiengesellschaft v. Schlunk,

486 U.S. 694, 705 (1988) ("[T]here has been no question in this country of excepting foreign

nationals from the protection of our Due Process Clause.").  The court concludes that service on

Koehler through Holland & Knight would satisfy the Mullane standard for constitutionally

sufficient notice, and thus would not violate federal law.

Recall that on May 13, 2024, counsel from Holland & Knight electronically filed USCIT

Form 11 Notices of Appearance on the court's docket in this case.  See Form 11 Notices.  Each

attorney signed and filed a form that states, "the undersigned appears as attorney for defendant,

Koehler Oberkirch GMBH and Koehler Paper SE, in this action . . . and requests that all papers be

---

[14] Nor would alternative service "deprive the German government of an opportunity to assess whether it might have a beneficial role to play in helping to negotiate an equitable resolution of the dispute."  Defs.' Resp. at 4–5.  That opportunity still exists.  While it may be that "[c]ollectability of judgment in this case is a matter on which the German government might well have views that could help resolve this dispute without further use of judicial resources," Defs.' Post-Oral Arg. Resp. at 2 n.2, the court is unpersuaded that the completion of service of process would forestall a hypothetical attempt by the German government to negotiate a resolution of this case with the United States.

served on him/her." Id. (underlining in originals).[15] Boilerplate[16] though this language may be, it

leaves no doubt that Holland & Knight can be relied on to inform its client of the existence of the

very action for which the client engaged its services.[17] See Mullane, 339 U.S. at 314.

Hypothetical[18] unreliability on this score might even constitute a violation of the District of

Columbia Rules of Professional Conduct, to which Holland & Knight's lead counsel is apparently

subject, and which provide that "[a] lawyer shall keep a client reasonably informed about the status

of a matter and promptly comply with reasonable requests for information."  D.C. Rs. Pro. Conduct

1.4(a).

      Koehler's invocation of United States v. Ziegler Bolt & Parts Co. for the proposition that

"[t]he mere relationship between a defendant and his attorney does not, in itself, convey authority

---

[15] The court does not address the separate question of whether these filings establish Koehler's amenability to service by the method of "delivering a copy of [the summons and complaint] to an agent authorized by appointment or by law to receive service of process."  USCIT R. 4(d)(2)(C). This is because, as explained above, the method of service proposed by the Government will not take place "Within a Judicial District of the United States."  USCIT R. 4(d).

[16] Koehler notes that USCIT Rule 75(b)(2) requires that notices of appearance "must be substantially in the form as set forth in Form 11 of the Appendix of Forms," and argues that "[a]ltering the form to materially change the substance (striking the language 'request[ing] that all papers be served on' counsel) would not have complied with CIT Rules."  Defs.' Post-Oral Arg. Resp. at 3 (quoting USCIT Form 11).  Without offering a view as to the legal hypothesis that "substantially in the form" refers to substance, the court notes that Koehler did not test this hypothesis by moving for the court's leave to submit a differently-worded form.

[17] It is also virtually certain that Koehler itself knows of pendency of this action.  Why, otherwise, would Holland & Knight have been authorized to enter an appearance in this case?  But actual notice, in any event, would not obviate adherence to USCIT Rule 4's service provisions.  See Wright & Miller, supra, § 1134 ("The primary function of Rule 4 is to provide the mechanism for bringing notice of the commencement of an action to the defendant's attention and to provide a ritual that marks the court's assertion of jurisdiction over the lawsuit.") (emphasis added).

[18] The court outlines this hypothetical scenario only for the purpose of illustration, and casts no doubt whatsoever on the integrity of either party's counsel.

to accept service" is misplaced.  111 F.3d 878, 881 (Fed. Cir. 1997).  The Federal Circuit in <u>Ziegler</u>

held on non-constitutional grounds that service on a defendant's attorney did not satisfy the

specific agency requirement of USCIT Rule 4(d)(3) (now USCIT Rule 4(g)(1)(B)).  <u>Id.</u>  That

stricter requirement is inapplicable to the <u>Mullane</u>-focused inquiry here.  The Government targets

Koehler's U.S. counsel not as an agent for accepting service under USCIT Rule 4(g)(1)(B), but as

an instrument for conveying it.

The attorney-client relationship at issue in <u>Ziegler</u>, moreover, pertained to an

administrative proceeding that was distinct from the litigation in which the Government sought to

serve the defendant.  The Government's evidence was "insufficient to show that Ziegler had

empowered [the attorney] to receive service <u>in the current action</u>."  <u>Id.</u> (emphasis added).  <u>Mrvic</u>,

the S.D.N.Y case, neatly illustrates this distinction.  <u>See</u> 652 F. Supp. 3d at 414–15.  In that case,

the district court declined the Government's request for service through an attorney who "indicated

he has not had recent communications with Defendant, attempted to reach him without success,

and does not have [contact] information for him," but granted the Government's request for service

through attorneys who "specifically communicated with the IRS in providing a substantive,

detailed, and lengthy protest letter to the IRS regarding the merits of the underlying . . . dispute

here," and who were unlikely to "have prepared this significant submission on behalf of Defendant

without extensive communications with Defendant."  <u>Id.</u> at 414.  Here, as with the second request

at issue in <u>Mrvic</u>, it would have been practically impossible for counsel from Holland & Knight to

participate in this litigation on Koehler's behalf without establishing a channel of communication

through which a Summons and Complaint could be reasonably presumed to travel.

Koehler raises a concern that granting the Government's request for service through Holland & Knight would impair future foreign defendants' ability "to retain counsel without mooting objections to service of process by establishing an avenue of alternative service." Defs.' Post-Oral Arg. Resp. at 3 n.6. Koehler envisions a malign outcome in which a foreign defendant cannot retain U.S. counsel to contest service without paradoxically rendering itself amenable to service through that counsel.

This outcome is not so malign as Koehler makes it out to be. No private defendant, foreign or domestic, enjoys a rebuttable procedural right to avoid service of process.[19] What a defendant instead enjoys is a procedural right to be properly served—which involves both compliance with USCIT Rule 4 as well as "notice reasonably calculated, under all the circumstances, to apprise [him] of the pendency of the action and afford [him] an opportunity to present [his] objections." Mullane, 339 U.S. at 314. A defendant may retroactively vindicate this latter right by asserting, in a motion, a defense of insufficient service of process. USCIT R. 12(b)(5). The defendant at that time may also raise other defenses or objections without waiving the insufficient-service defense. USCIT R. 12(b). But until service is attempted, a defendant has no cognizable interest in engaging U.S. counsel for prospective advice on how to avoid being served at all.

---

[19] The due process considerations pertaining to service of process are in this sense distinguishable from those pertaining to personal jurisdiction. Those latter considerations require that a defendant "have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice". Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

### IV.    *Service Through Koehler's U.S. Counsel Would not Contravene an Applicable International Agreement*

The court's remaining task is to ensure that service on Koehler through Holland & Knight would not constitute means "prohibited by international agreement."  USCIT R. 4(e)(3); <u>see</u> Gov't Br. at 8.  It would not.  Koehler does not specify an international agreement other than the Hague Convention that would prohibit the means of service proposed by the Government, and the court is not aware of any.  And the Hague Convention, according to the German court in Baden-Württemberg, is "not applicable to the servicing of the documents" because this case is not a "civil or commercial matter."  Gov't Br. Ex. B at 2; <u>see also</u> Hague Convention, <u>supra</u>, at art. 1.  This court has no occasion to disturb the German court's legal conclusion on this point.  Neither party makes such a request, and the court in any event "has no practical ability to require the German Central Authority to effect service under an international convention that it has determined does not apply."  <u>Bunk</u>, 2010 WL 423247, at *4.

It is accordingly unnecessary to determine at this stage whether the terms of the Hague Convention, if applicable, would prohibit the "other means" of service proposed by the Government in this case.  USCIT R. 4(e)(3).  The Government has made a sufficient showing that service through Holland & Knight would not contravene any applicable international agreement. See <u>id.</u>; <u>see also</u> Gov't Br. at 8.[20]

### CONCLUSION

Koehler asserts that service through its U.S. counsel—an action that would manifestly

---

[20] As the court grants the Government's request to serve Koehler through Holland & Knight, the court does not address the Government's alternative requests to serve Koehler (1) through Steptoe (Koehler's U.S. counsel in the <u>Matra</u> litigation) or (2) through email.  The court holds those requests in abeyance.  The court will consider them on the Government's renewed motion, if necessary, without the need for further briefing.

result in Koehler's awareness of the Government's action to recover Customs duties, and thus allow the judicial process to resume its course—would implicate "serious issues of international relations at stake in this case . . . ." Defs.' Br. at 4.

Koehler is correct in the broad sense that any service on a foreign defendant necessarily implicates an important issue of international relations. That issue is fairness. Foreign and domestic litigants alike are entitled to their day in court. See Schlunk, 486 U.S. at 705. USCIT Rule 4 is a mechanism that helps ensure that a defendant—no matter where it is in the world, and no matter its nationality—has an opportunity to vindicate its rights before the U.S. Court of International Trade.

But that does not mean that defendant may rely on USCIT Rule 4's protections as a defensive moat against a plaintiff's attempts to vindicate its own rights through the judicial process in the United States. Cf. USCIT R. 1 ("[The USCIT Rules] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). Koehler is entitled to notice, but not to the avoidance of notice.

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff's Motion for Alternative Service is **GRANTED**; and it is further

**ORDERED** that Plaintiff may, in accordance with the relevant provisions of USCIT Rule 4, effect service of the Summons and Amended Complaint on Defendants through the delivery of copies thereof to Defendant's counsel of record in this matter.

**SO ORDERED**.

/s/    *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: August 21, 2024
New York, New York