Slip Op. 25-31

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **UNITED STATES,**<br><br>                **Plaintiff,**<br><br>        **v.**<br><br>**KOEHLER OBERKIRCH GMBH, f/k/a PAPIERFABRIK AUGUST KOEHLER SE, f/k/a PAPIERFABRIK AUGUST KOEHLER AG; and KOEHLER PAPER SE,**<br><br>                **Defendants.** | **Before: Gary S. Katzmann, Judge**<br>**Court No. 24-00014** |

## OPINION

[ The court denies Defendants' Motion to Dismiss. ]

Dated: <u>March 27, 2025</u>

<u>Luke Mathers</u>, Trial Attorney, U.S. Department of Justice, of New York, N.Y, argued for Plaintiff the United States. With him on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Field Office, and <u>Edward F. Kenny</u>, Senior Trial Counsel. Of counsel were <u>Sasha Khrebtukova</u>, Attorney, and <u>Brandon T. Rogers</u>, Senior Attorney, Offices of the Assistant Chief Counsel, U.S. Customs and Border Protection, of New York, N.Y. and Indianapolis, IN.

<u>John F. Wood</u>, Holland & Knight LLP, of Washington, D.C., argued for Defendants Koehler Oberkirch GmbH and Koehler Paper SE. With him on the brief were <u>Andrew McAllister</u>, <u>Anna P. Hayes</u>, and <u>Stuart G. Nash</u>.

    Katzmann, Judge: Plaintiff the United States ("the Government") aims to collect over a

quarter-billion dollars in unpaid antidumping duties and interest from Defendants Koehler

Oberkirch GmbH ("Koehler Oberkirch") and Koehler Paper SE ("Koehler Paper"), a pair of

affiliated German producers[1] of thermal paper.[2]  The Government hopes to obtain that relief

through a civil action in this court, which has exclusive jurisdiction over "any civil action which

arises out of an import transaction and which is commenced by the United States . . . to recover

customs duties."  28 U.S.C. § 1582; see Am. Compl. ¶ 1, Feb. 8, 2024, ECF No. 4 ("Complaint").

Defendants have opposed this effort at every turn.  They first contested the Government's

request to effect "alternative" service of process through Defendants' U.S.-based counsel.  See

Defs.' Resp. in Opp'n to Mot. for Alt. Serv., May 13, 2024, ECF No. 11.  When the court granted

that request, see Alternative Service Order, 48 CIT __, 728 F. Supp. 3d 1322, Defendants moved

for leave to file an interlocutory appeal.  See Am. Mot. for Certification of Appealability, Sept. 5,

2024, ECF No. 33.  After the court denied that motion, see Certification Denial, 48 CIT __, 731

F. Supp. 3d 1377, Defendants petitioned the U.S. Court of Appeals for the Federal Circuit

("Federal Circuit") for a writ of mandamus that would compel reversal of the order permitting

service.  The writ did not issue.  See In re Koehler Oberkirch GmbH, No. 2025-106, 2025 WL

212067 (Fed. Cir. Jan. 16, 2025) (Order).

---

[1] The court in its prior opinions has referred to Defendants collectively as "Koehler."  See generally
United States v. Koehler Oberkirch GmbH, 48 CIT __, 728 F. Supp. 3d 1322 (2024) ("Alternative
Service Order"); United States v. Koehler Oberkirch GmbH, 48 CIT __, 731 F. Supp. 3d 1377
(2024) ("Certification Denial").  Because the relationship between various "Koehler" entities is
now directly at issue, the court will make individualized references to those entities.  The court
will also make collective references to "Defendants."

[2] Thermal paper is paper that "form[s] an image when heat is applied."  Antidumping Duty Orders:
Lightweight Thermal Paper from Germany and the People's Republic of China, 73 Fed. Reg.
70959, 70960 (Dep't Com. Nov. 24, 2008) ("Antidumping Duty Order").  While the underlying
concept of heat-activated writing dates to antiquity, see Nat'l Bureau of Standards, Circular C413,
Inks at 37 (Dep't Com. 1937) (collecting attestations by Pliny the Elder and Ovid), today thermal
paper is "typically (but not exclusively) used in point-of-sale applications such as ATM receipts,
credit card receipts, gas pump receipts, and retail store receipts."  Antidumping Duty Orders, 73
Fed. Reg. at 70960.

Defendants now move to dismiss this action, asserting defenses of (1) insufficient service of process as to both Defendants and (2) lack of personal jurisdiction over Koehler Paper.  See Mot. to Dismiss, Oct. 24, 2024, ECF No. 43 ("Motion to Dismiss"); USCIT R. 12(b)(2), (5).  This motion presents issues of due process and civil procedure that—for all their significance to international commerce—are rarely litigated before the U.S. Court of International Trade ("USCIT").  The central issue is this: where a successor entity inherits its corporate predecessor's liabilities, when does it also inherit the predecessor's jurisdictional contacts?

The court concludes that the Government's allegations here, in light of controlling and persuasive authority, support imputing Koehler Oberkirch's jurisdictional contacts to Koehler Paper.  For this reason, and for the others that follow, the court denies Defendants' Motion to Dismiss in its entirety.

## BACKGROUND

The court first presents the legal, factual, and procedural background relevant to the Motion to Dismiss.

### I.    Legal Background: Personal Jurisdiction in Proceedings Before the U.S. Court of International Trade

The court's rules[3] provide that "[f]or a claim that arises under federal law, serving a summons . . . establishes personal jurisdiction over a defendant if: (A) the defendant is not subject

---

[3] The relevant provision is identical to Federal Rule of Civil Procedure 4(k)(2), which the Federal Circuit has described as "a federal long-arm statute[] which allows a district court to exercise personal jurisdiction over a foreign defendant whose contacts with the United States, but not with the forum state, satisfy due process."  Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico, 563 F.3d 1285, 1296 (Fed. Cir. 2009); see also United States v. Zatkova, 35 CIT 1059, 1061 n.1, 791 F. Supp. 2d 1305 n.1 (2011) ("USCIT Rule 4 is substantially identical to Federal Rule of Civil Procedure 4; therefore, the court may consider decisions and commentary on Federal Rule of Civil Procedure 4 for guidance.").

to jurisdiction in any of the state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." USCIT R. 4(j)(2).[4]  In a case like this, where no state or federal law appears to limit the exercise of personal jurisdiction, this provision means that the limits of personal jurisdiction are coextensive with what due process allows.  See Daimler AG v. Bauman, 571 U.S. 117, 125 (2014) ("California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution.  We therefore inquire whether the Ninth Circuit's holding comports with the limits imposed by federal due process."); see also Touchcom, Inc. v. Bereskin & Parr, 574 F.3d 1403, 1411 (Fed. Cir. 2009) ("[T]he statutory and constitutional inquiries coalesce into the question whether due process is satisfied by the court's exercise of personal jurisdiction . . . .").

Personal jurisdiction over an out-of-forum defendant satisfies due process only where the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. State of Wash., Off. of Unemp. Comp. & Placement, 326 U.S. 310, 316 (1945) (internal quotation marks and citations omitted) (addressing the due process clause of the Fourteenth Amendment).[5] Relevant here is the subcategory of "specific jurisdiction," which applies where "the suit 'arises

---

[4] The first of these elements is trivially satisfied here: the court has "exclusive jurisdiction of any civil action which arises out of an import transaction and which is commenced by the United States . . . (3) to recover customs duties." 28 U.S.C. § 1582 (emphasis added).

[5] "Because subject matter jurisdiction over [this] action exists by virtue of a federal question, rather than the diversity of the parties, the Due Process Clause that is at issue here is the Due Process Clause of the Fifth Amendment." Akro Corp. v. Luker, 45 F.3d 1541, 1544 (Fed. Cir. 1995) (internal quotation marks and citation omitted).  But this distinction is immaterial for present purposes.  The Federal Circuit has held that International Shoe's minimum-contacts framework applies to both the Fifth and Fourteenth Amendments.  See id. at 1545.

out of or relates to the defendant's contacts with the forum.'" <u>Daimler</u>, 571 U.S. at 127 (quoting

<u>Helicopteros Nacionales de Colom., S.A. v. Hall</u>, 466 U.S. 408, 414 n.8 (1984)) (alterations

omitted).

For the purpose of specific jurisdiction, "it is essential in each case that there be some act

by which the defendant purposefully avails itself of the privilege of conducting activities within

the forum State, thus invoking the benefits and protections of its laws." <u>Hanson v. Denckla</u>, 357

U.S. 235, 253 (1958). The Federal Circuit has "outlined a three-factor test for specific jurisdiction,

which considers whether (1) the defendant purposefully directed its activities at residents of the

forum, (2) the claim arises out of or relates to the defendant's activities with the forum, and (3)

assertion of personal jurisdiction is reasonable and fair." <u>Synthes</u>, 563 F.3d at 1297 (addressing

the standard for patent actions governed by Federal Circuit law). In the importation context, where

"[t]he allegations are that defendants purposefully shipped" merchandise into the forum "through

an established distribution channel," and where "[t]he cause of action . . . is alleged to arise out of

these activities[, n]o more is usually required to establish specific jurisdiction." <u>Beverly Hills Fan

Co. v. Royal Sovereign Corp.</u>, 21 F.3d 1558, 1565 (Fed. Cir. 1994). The inquiry in this case,

which does not concern imports into any particular state, is whether Defendants have minimum

jurisdictional "contacts with the nation as a whole." <u>Synthes</u>, 563 F.3d at 1296.

## II.    *Factual History*

The court next summarizes the facts relevant to the Motion to Dismiss, drawing from the

allegations in the Complaint and assuming familiarity with the facts recounted in the <u>Alternative

Service Order</u>, 48 CIT at __, 728 F. Supp. 3d at 1325–28, and in the <u>Certification Denial</u>, 48 CIT

at __, 731 F. Supp. 3d at 1378–79.

Between 2008 and 2013, imports of lightweight thermal paper from Germany were subject

to an antidumping order imposed by the U.S. Department of Commerce ("Commerce"). <u>See</u> <u>Antidumping Duty Order</u>, 73 Fed. Reg. 70959; <u>Lightweight Thermal Paper from the People's</u> <u>Republic of China and Germany: Continuation of the Antidumping and Countervailing Duty</u> <u>Orders on the People's Republic of China, Revocation of the Antidumping Duty Order on</u> <u>Germany</u>, 80 Fed. Reg. 5083 (Dep't Com. Jan. 30, 2015). Two of the producers subject to this order at the time of its imposition were Papierfabrik August Koehler AG and Koehler America, Inc. <u>See</u> <u>Antidumping Duty Order</u>, 73 Fed. Reg. at 70960.

While the Antidumping Duty Order was in place, Commerce found that Papierfabrik August Koehler was engaged in a scheme of a "serious and egregious nature" to manipulate and conceal certain sales data. Mem. from C. Marsh to P. Piquado, re: Issues and Decision Memorandum at 7, Case No. A-428-840, Bar Code: 3129807-01 (Dep't Com. Apr. 11, 2013). Commerce accordingly made an adverse inference that drove the duty rate on imports of Papierfabrik August Koehler AG's merchandise up to 75.36 percent <u>ad valorem</u>. <u>See</u> <u>Lightweight</u> <u>Thermal Paper from Germany: Final Results of Antidumping Duty Administrative Review;</u> <u>2010–2011</u>, 78 Fed. Reg. 23220, 23221 (Dep't Com. Apr. 18, 2013). That rate now applies with finality to Papierfabrik August Koehler AG's entries of thermal paper for the period between November 2009 and October 2011. <u>See</u> <u>Alternative Service Order</u>, 48 CIT at __, 728 F. Supp. 3d at 1326. According to the Government, the unpaid balance of the associated antidumping duty liability (including statutory interest) is $267,530,486.57 as of February 3, 2025. Pl.'s Post-Arg. Submission at 4 n.3, Feb. 5, 2025, ECF No. 54.

Papierfabrik August Koehler AG has allegedly undergone a series of corporate transformations since the entries of the merchandise in question. First, "[i]n 2012, Papierfabrik

August Koehler AG became known as Papierfabrik August Koehler SE by converting to a different corporate form."  Compl. ¶ 7.  Then, in April 2021, Papierfabrik August Koehler SE underwent "what it publicly described as a 'spin-off,' whereby certain assets and liabilities were transferred to a new company called Koehler Paper SE."  Id. ¶ 29.  This transfer included "control over profitable manufacturing subsidiary Koehler Kehl GmbH," id. ¶ 35, and it left Papierfabrik August Koehler SE with assets of "less than a quarter of what they were at the close of the prior fiscal year before the 'spin-off.'"  Id. ¶ 36.  "[A]fter the 'spin-off,' paper manufactured by Koehler Kehl GmbH was being sold by Koehler Paper SE rather than [Papierfabrik August] Koehler [SE]."  Id. ¶ 37.  Neither entity's financial statement for Fiscal Year 2021 contained "any mention" of what at the time was "the $193,631,642.08 debt owed to Customs."  Id. ¶ 41.  "As a direct result of the 'spin-off,'" the Government alleges, "Koehler now lacks assets sufficient to pay its debts to Customs . . . ."  Id. ¶ 42.  Finally, "[i]n November 2021, Papierfabrik August Koehler SE became Koehler Oberkirch GmbH through 'a statutory conversion, i.e., the actual business entity continues to be the same.'"  Id. ¶ 5 (quoting Koehler Paper, Name-change: "Papierfabrik August Koehler SE" is now "Koehler Oberkirch GmbH" (Dec. 20, 2021), https://www[.]koehlerpaper[.]com /en/news/publications/name-change_PAK-SE[.]php (last visited Mar. 27, 2025)).

Immediately after the announcement of Papierfabrik August Koehler SE's "conversion" into Koehler Oberkirch, Koehler Paper initiated a separate action before this court to challenge a determination related to a different Commerce antidumping order on imports of thermal paper from Germany.  See Summons, Koehler Paper SE v. United States, No. 21-633 (USCIT filed Dec. 22, 2021), ECF No. 1 ("2021 Summons").  Koehler Paper made the following representation to the court in its summons:

> Koehler Paper SE is the successor-in-interest to Koehler Oberkirch GmbH (formerly known as Papierfabrik August Koehler SE) and therefore has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c), as it is the successor-in-interest to a participant in the investigation that gave rise to the contested determination.

Id. at 1 (emphasis added) (footnote omitted).  A footnote to this statement elaborated as follows:

> Effective May 3, 2021, Koehler Paper SE acquired Koehler Kehl GmbH, the legal entity that directly owns the facilities that manufacture subject merchandise, from Papierfabrik August Koehler SE. Effective November 26, 2021, Papierfabrik August Koehler SE changed its name and legal form and is now known as "Koehler Oberkirch GmbH[.]"  Koehler Oberkirch GmbH is a wholly owned subsidiary of Koehler Paper SE.

Id. at 1 n.1.  Koehler Paper's action was eventually consolidated into a single lead case.  See Matra Ams., LLC v. United States, 48 CIT __, __, 681 F. Supp. 3d 1339, 1357–58 (2024).

To sum up the Government's allegations: Papierfabrik August Koehler AG produced thermal paper and exported it to the United States.  It then changed its corporate form to become Papierfabrik August Koehler SE, which in turn participated in a two-step "spin-off" that consisted of (1) the creation of Koehler Paper and (2) the transfer to Koehler Paper of certain assets and liabilities.  What remained of Papierfabrik August Koehler SE then underwent a "statutory conversion" to become Koehler Oberkirch.  And as of 2021, Koehler Oberkirch is a wholly owned subsidiary of Koehler Paper.

### III.   Procedural History

On January 24, 2024, the Government initiated this action "against Koehler Oberkirch GmbH and its successor-in-interest, Koehler Paper SE, to recover unpaid antidumping duties and pre-liquidation interest . . . ."  Compl. ¶ 1; see Summons, Jan. 24, 2024, ECF No. 1; Confidential Am. Compl., Oct. 22, 2024, ECF No. 42.  The Government moved for a court order permitting service of the Summons on Defendants through their U.S.-located counsel on April 22, 2024.  See

Court No. 24-00014                                                                                                                    Page 9

Mot. for Alternative Service, Apr. 22, 2024, ECF No. 7.  The court granted this motion on August

21, 2024, see Alternative Service Order, 48 CIT __, 728 F. Supp. 3d 1322, and the Government

delivered the Summons to Defendants' counsel in Washington, DC on August 22, 2024, see Proof

of Service, Aug. 27, 2024, ECF No. 27.  Defendants then moved to certify the Alternative Service

Order for interlocutory appeal to the Federal Circuit pursuant to 28 U.S.C. § 1292, see Am. Mot.

for Certification of Appealability, and this court denied that motion on October 10, 2024, see

Certification Denial, 48 CIT __, 731 F. Supp. 3d 1377.  Defendants then petitioned the Federal

Circuit for a writ of mandamus that would reverse the Alternative Service Order.  See Pet. for Writ

of Mandamus, In re Koehler Oberkirch GmbH, No. 2025-106 (Fed. Cir. Oct. 31, 2024).  The

Federal Circuit denied this petition on January 16, 2025, explaining that this court did not clearly

exceed its authority in ordering alternative service.  See In re Koehler Oberkirch GmbH, No.

2025-106, 2025 WL 212067 (Order).

On October 24, 2024, one week before the filing of the mandamus petition, Defendants

filed the instant Motion to Dismiss and concurrently filed a motion for oral argument.  See Mot.

to Dismiss; Mot. for Oral Arg., Oct. 24, 2024, ECF No. 44.  The Government responded to the

Motion to Dismiss on November 27, 2024, see Pl.'s Resp. in Opp'n to Mot. to Dismiss, Nov. 27,

2024, ECF No. 46 ("Pl.'s Resp."), and Defendants filed a reply on December 18, 2024, see Defs.'

Reply in Supp. of Mot. to Dismiss, Dec. 18, 2024, ECF No. 47 ("Defs.' Reply").  The court then

granted Defendants' Motion for Oral Argument on December 23, 2024, and scheduled oral

argument for January 29, 2025.  See Order, Dec. 23, 2024, ECF No. 48.  The court issued

substantive questions to the parties in advance of oral argument and solicited written responses.

See Letter from the Ct., Jan. 14, 2025, ECF No. 49 ("Ct.'s Oral Arg. Qs.").  The parties timely

submitted these responses.  See Pl.'s Resp. to Ct. Order, Jan. 24, 2025, ECF No. 51 ("Pl.'s OAQ Resp."); Defs.' Resp. to Ct. Order, Jan. 24, 2025, ECF No. 52 ("Defs.' OAQ Resp.").  At oral argument, which took place as scheduled, the court invited the parties to file post-argument submissions; both parties again responded with timely written submissions.  See Pl.'s Post-Arg. Submission; Defs.' Post-Arg. Submission, Feb. 5, 2025, ECF No. 55.

With all filings in hand, the court turns to the merits of Defendants' Motion to Dismiss.

## JURISDICTION AND STANDARD FOR DETERMINATION

The court has subject matter jurisdiction under 28 U.S.C. § 1582, which vests the U.S. Court of International Trade with exclusive jurisdiction over "any civil action which arises out of an import transaction and which is commenced by the United States . . . (3) to recover customs duties."  See Compl. ¶ 1.

Defendants' Motion to Dismiss challenges the sufficiency of the allegations of the Complaint as a basis for personal jurisdiction.  See Mot. to Dismiss at 3–5.  In this procedural posture the court "must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor."  Elecs. for Imaging, Inc. v. Coyle, 340 F.3d 1344, 1349 (Fed. Cir. 2003); see also M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda., 890 F.3d 995, 999 (Fed. Cir. 2018).  "[I]n the absence of an evidentiary hearing, a plaintiff need only make a prima facie showing that defendants are subject to personal jurisdiction."  Genetic Veterinary Scis., Inc. v. LABOKLIN GmbH & Co. KG, 933 F.3d 1302, 1309 (Fed. Cir. 2019).

## DISCUSSION

As noted above, Defendants seek dismissal on two grounds.  They first argue that dismissal is warranted under USCIT Rule 12(b)(5) because the Government's completion of service of

process through Defendants' U.S. counsel "was improper and insufficient." Mot. to Dismiss at 2.

They next argue that Koehler Paper is not subject to the court's personal jurisdiction because it

lacks the minimum contacts to the forum United States that would satisfy due process. Id. at 3–5.

The court addresses these arguments in turn.

### I.     Dismissal for Insufficient Service of Process Is not Warranted

Defendants state that the Government's service was procedurally insufficient. See Mot. to

Dismiss at 2–3. They accordingly contend that the court should dismiss this action under USCIT

Rule 12(b)(5), which provides for a defense of insufficient service of process. Id. at 2. Defendants

also contend that this asserted service defect warrants dismissal for lack of personal jurisdiction

under USCIT Rule 12(b)(2). Id. (citing Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97,

104 (1987)).

Defendants do not support these contentions with any new arguments, opting instead to

"incorporate by reference their prior arguments here as a matter of precaution and to avoid any

appearance of waiver of this defense." Id. Defendants raised these "prior arguments" in their

opposition to the Government's Motion for Alternative Service. See Defs.' Resp. in Opp'n to Mot.

for Alt. Serv. at 3–7.

The Government responds that Defendants, by simply incorporating these arguments by

reference, have failed to preserve them. See Defs.' Resp. at 6 n.2 (citing Sosa v. Alvarez-Machain,

542 U.S. 692, 735 n.24 (2004)). The Government also points out that "the [c]ourt has already

rejected the defendants' arguments" in the opinion accompanying the Alternative Service Order.

Id.

Preserved or not, Defendants' "incorporate[d]" arguments do not persuade. As the court

explained at length when it granted the Government's Motion for Alternative Service, the

Government's delivery of the Summons to Defendants' U.S. counsel was a proper and sufficient means of effecting service of process.  See generally Alternative Service Order, 48 CIT __, 728 F. Supp. 3d 1322.  Defendants do not offer any reason why the court should repastinate[6] that element of its opinion.  Nor do they point to any difference between the procedural postures of the Motion for Alternative Service and the instant Motion to Dismiss that might bear on the court's consideration of whether service through Defendants' U.S.-based counsel was sufficient.  As it is "the practice of courts," including this one, "generally to refuse to reopen what has been decided," the Alternative Service Order forecloses Defendants' service-related contentions here.  Messenger v. Anderson, 225 U.S. 436, 444 (1912); see also Shenzhen Xinboda Indus. Co. v. United States, 42 CIT __, __, 357 F. Supp. 3d 1295, 1309 (2018) ("[T]he law of the case doctrine applies to issues that have previously been resolved.").

The court accordingly denies Defendants' Motion to Dismiss insofar as Defendants seek dismissal for insufficient service of process under USCIT Rule 12(b)(5).  See Mot. to Dismiss at 2–3.  The court also denies the Motion to Dismiss insofar as Defendants challenge personal jurisdiction on service-related grounds.  See id.

## II.    *Koehler Paper SE Is Subject to the Court's Personal Jurisdiction in This Matter*

The court next turns to the more fully developed element of Defendants' Motion to

---

[6] Repastinate" means "[t]o dig or cultivate again in preparation for planting."  Repastinate, Oxford English Dictionary (rev. July 2009).  It was often deployed in a figurative sense by Judge Bruce Selya, see id., who for more than forty years on the United States Court of Appeals for the First Circuit was renowned for his erudition and the extraordinary vocabulary he brought to his opinions.  See Andrew J. Kerr, The Perfect Opinion, 12 Wash. Univ. Juris. Rev. 221, 257–65 (2020); Frederick A. Brodie, A Guide to 'Selyaisms', National Law Journal (Jan 28, 2008, 12:00 AM), https[:]//www[.]law.com/nationallawjournal/almID/1201169140964/; Trip Gabriel, Bruce M. Selya, Federal Judge Known for Polysyllabic Prose, Dies at 90, N.Y. Times, Mar. 21, 2025, at B11.

Dismiss.  Defendants argue that the court lacks specific[7] personal jurisdiction over Koehler Paper

because that entity "is not alleged to have taken any action in the United States that gave rise to

the allegations in the Complaint."   Mot. to Dismiss at 5.   Defendants contend that the

Government's allegations "arise solely out of the creation of Koehler Paper," which was a

corporate restructuring that took place within Germany under German law.  Id.  Koehler Paper,

they maintain, thus lacks forum contacts that would satisfy due process.  Id. at 3 (citing Ford Motor

Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 358–59 (2021)).

The Government responds with two reasons why Koehler Paper is subject to specific

jurisdiction.  See generally Pl.'s Resp.

The Government first advances a theory of successor jurisdiction, arguing that Koehler

Paper has voluntarily inherited the jurisdictional contacts of Koehler Oberkirch.  See Pl.'s Resp.

at 6–11.  This argument begins from the premise that Koehler Oberkirch uncontestedly availed

itself of the forum by importing thermal paper into the United States (as Papierfabrik August

Koehler AG) and accruing antidumping liability on those imports.  Pl.'s Resp. at 7–8 & n.3.  The

Government further argues that Koehler Paper is Koehler Oberkirch's successor in interest, and

finally that an entity is subject to a court's personal jurisdiction if it is the successor in interest to

an entity whose forum contacts establish specific jurisdiction.  Id. at 7–8.  On this three-legged

stool, the Government rests the contention that Koehler Paper is subject to the court's personal

jurisdiction.

The Government's second jurisdictional theory is that Koehler Paper effectively consented

_____

[7] The Government does not argue that either Defendant is subject to the court's general personal
jurisdiction.

to the court's assertion of personal jurisdiction in this action when it initiated a separate action

before this court in 2021—an action that was eventually consolidated into the <u>Matra</u> litigation.  <u>Id.</u>

at 11–12; <u>see</u> 2021 Summons.  This, the Government contends, is because "[w]hen a plaintiff has,

'by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction

of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes

for which justice to the defendant requires his presence.'"  Pl.'s Resp. at 11 (quoting <u>Adam v.</u>

<u>Saenger</u>, 303 U.S. 59, 67–68 (1938)); <u>see also</u> <u>Bel-Ray Co. v. Chemrite (Pty) Ltd.</u>, 181 F.3d 435,

443 (3d Cir. 1999) ("[W]here a party seeks affirmative relief from a court, it normally submits

itself to the jurisdiction of the court with respect to the adjudication of claims arising from the

same subject matter.").  The <u>Antidumping Duty Order</u> that gave rise to the unpaid duties at issue

in this case has a scope that overlaps with the scope of the determination that Koehler Paper

challenged (and continues to challenge) in the <u>Matra</u> litigation.[8]  This similarity, the Government

---

[8] The scope of the <u>Antidumping Duty Order</u>:

> includes certain lightweight thermal paper, which is thermal paper with a basis
> weight of 70 grams per square meter ($g/m^2$) (with a tolerance of $\pm 4.0 \ g/m^2$) or less;
> irrespective of dimensions; with or without a base coat on one or both sides; with
> thermal active coating(s) on one or both sides that is a mixture of the dye and the
> developer that react and form an image when heat is applied; with or without a top
> coat; and without an adhesive backing.

73 Fed. Reg. at 70960 (footnotes omitted).  A footnote to this scope description further specifies
that "[b]oth jumbo and converted rolls (as well as [lightweight thermal paper] in any other form,
presentation, or dimension) are covered by the scope of these orders."  <u>Id.</u> at 70960 n.1.  The
determination at issue in the <u>Matra</u> litigation, meanwhile, covers "jumbo rolls and converted rolls
of thermal paper with or without a base coat . . . on one or both sides; with thermal active
coating(s) . . . on one or both sides; with or without a top coat . . . , and without an adhesive
backing."  <u>Thermal Paper from Germany: Final Affirmative Determination of Sales at Less Than</u>
<u>Fair Value and Final Affirmative Determination of Critical Circumstances, in Part</u>, 86 Fed. Reg.
54152, 54154 (Dep't Com. Sept. 30, 2021).  That description also specifies that "[a]ll jumbo rolls
are included in the scope regardless of the basis weight of the paper," and that "[a]lso included in

argues, means that Koehler Paper cannot fairly challenge one determination as a plaintiff without consenting to jurisdiction as a defendant in an action involving the other determination. Pl.'s Resp. at 12. The question this raises is whether Koehler Paper's initiation before the court of a challenge to the 2021 determination is an "action[] of the defendant [that] amount[s] to a legal submission to the jurisdiction of the court" in this action. Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinée, 456 U.S. 694, 704–05 (1982).

The court finds the first of the Government's theories (relating to successor jurisdiction) persuasive for the reasons set forth below. It is accordingly unnecessary to reach the second.

### A.    Koehler Oberkirch Undisputedly Has Sufficient Jurisdictional Contacts with the United States.

The first premise of the Government's successor-jurisdiction theory is the simplest: it is that Koehler Oberkirch, as the direct corporate continuation of the importer of record of the subject thermal paper, established sufficient contacts with the United States to render the court's exercise of personal jurisdiction over Koehler Oberkirch consistent with due process. This is correct. For one thing, Defendants have waived any due process objection to personal jurisdiction over Koehler Oberkirch. They state that "Defendants' jurisdictional argument regarding Koehler Oberkirch is limited at this time to the service of process issue." Defs.' OAQ Resp. at 1. That straightforwardly entails waiver. See USCIT R. 12(h)(1)(B)(i).

Personal jurisdiction over Koehler Oberkirch would likely lie even without waiver. It would be surprising if the importation of 1,462 entries of thermal paper into the United States over the course of two years, for an action that directly concerns those entries, does not establish "certain

---

the scope are 'converted rolls' with an actual width of less than 4.5 inches, and with an actual basis weight of 70 [$g/m^2$] or less." Id.

minimum contacts with [the United States] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice."   Int'l Shoe, 326 U.S. at 316; see also Beverly Hills Fan, 21 F.3d at 1565; Compl. ¶ 9.

### B.    *Koehler Paper is Koehler Oberkirch's Successor in Interest.*

The second of the Government's jurisdictional premises, by contrast, is a matter of stark disagreement.  Defendants maintain that Koehler Paper is not Koehler Oberkirch's successor in interest. Defs.' Reply at 3–4; Defs.' OAQ Resp. at 1.  The Government points out that in the 2021 Summons, Koehler Paper affirmed that that it is Koehler Oberkirch's successor in interest.  See Pl.'s Resp. at 8 n.4; 2021 Summons.  That prior statement, according to the Government, estops Defendants from now disclaiming the successor-in-interest relationship.  See Pl.'s OAQ Resp. at 2.  The Government also argues that Defendants do not "dispute that the Government's allegations, accepted as true, establish that Koehler Oberkirch's 'spin-off' to Koehler Paper deems it a successor-in-interest to Koehler Oberkirch under federal common law."  Pl.'s Resp. at 8.

The court first examines the Government's estoppel contention.  The text and context of the 2021 Summons do appear to undercut Defendants' current position.  Recall that Koehler Paper stated, in the "[n]ame and standing of plaintiffs" field of its USCIT Form 3 filing, that "Koehler Paper SE is the successor-in-interest to Koehler Oberkirch GmbH."  2021 Summons at 1.  Recall as well that Koehler Paper represented in the same filing that "Koehler Oberkirch GmbH is a wholly owned subsidiary of Koehler Paper SE."  Id. at 1 n.1.

Read in context, this is more than just a statement that Koehler Paper is Koehler Oberkirch's general-purpose successor in interest.  It is a specific statement that Koehler Paper is the successor to Koehler Oberkirch's antidumping duty liability.  Because Koehler Paper filed the

Court No. 24-00014                                                                                     Page 17

2021 Summons in an action challenging the amount of antidumping duties on imports of thermal

paper from Germany, see Matra, 48 CIT at __, 681 F. Supp. 3d at 1357, the only "interest" in the

action that Koehler Paper could have inherited from Koehler Oberkirch was an interest in reducing

the liability associated with those duties.

Defendants nevertheless answered "[n]o" to the court's question of whether they "maintain

that 'Koehler Paper SE is the successor in interest to Koehler Oberkirch GmbH (formerly known

as Papierfabrik August Koehler SE).'" Defs.' OAQ Resp. at 1; Ct.'s Oral Arg. Qs. at 3 (quoting

2021 Summons at 1).

This they cannot do. Under the rule of judicial estoppel, "where a party assumes a certain

position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter,

simply because his interests have changed, assume a contrary position . . . ." New Hampshire v.

Maine, 532 U.S. 742, 749 (2001) (quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895)) (alteration

omitted). The Federal Circuit has explained that the rule's application depends on:

> (1) whether the party's later position is clearly inconsistent with its earlier position;
> (2) whether the party has succeeded in persuading a court to accept that party's
> earlier position, so that judicial acceptance of an inconsistent position in a later
> proceeding would create the perception that either the first or the second court was
> misled; and (3) whether the party seeking to assert an inconsistent position would
> derive an unfair advantage or impose an unfair detriment on the opposing party if
> not estopped.

Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States, 593 F.3d 1346, 1354 (Fed. Cir.

2010) (internal quotations, citations, and alterations omitted) (quoting id. at 750–51).

Each of these circumstances pertains in this case. Defendants' earlier position that Koehler

Paper is Koehler Oberkirch's successor in interest is "clearly inconsistent" with Defendants'

express negation of it[9] in support of the Motion to Dismiss.  Id.; see Defs.' OAQ Resp. at 1.

Defendants succeeded in maintaining the earlier position in the action that began with the 2021

Summons.  That action has proceeded to the stage of motions for judgment on the agency

record—the matter is now before Commerce on remand—without any question arising as to the

Koehler parties' standing.  See generally Matra, 48 CIT __, 681 F. Supp. 3d 1339.  And Defendants

here would no doubt "derive an unfair advantage or impose an unfair detriment on the opposing

party if not estopped."  New Hampshire v. Maine, 532 U.S. at 751.  Defendants asserted a

successor-in-interest relationship to establish Article III jurisdiction in one action, and now deny

that relationship's existence to contest personal jurisdiction in another.  The Government cannot

be fairly expected to litigate uphill both ways on the same issue.

　　　　Other jurisprudential considerations also warrant estoppel.  Defendants raise certain

arguments in support of the Motion to Dismiss that are irreconcilable with Defendants'

---

[9] Defendants reject the notion that the 2021 Summons is inconsistent with the Motion to Dismiss briefing, arguing that "the fact that a party may be a successor-in-interest for certain purposes (such as liability) does not mean that there is automatically personal jurisdiction based on the status of any predecessor."  Defs.' Post-Arg. Submission at 2.  They further argue that "because the Government's only basis for claiming jurisdiction exists in this case is fraud, and fraud was not the basis for Koehler Paper's 2021 successor-in-interest statement and that issue was never litigated, Koehler Paper has not 'admitted' it is Koehler Oberkirch's successor-in-interest for the purposes of this action."  Defs.' OAQ Resp. at 2.

This conflates the issue of whether Koehler Paper is Koehler Oberkirch's successor in interest for the purpose of antidumping duty liability with the issue of whether the alleged successor-in-interest relationship permits imputing Koehler Oberkirch's jurisdictional contacts to Koehler Paper. Although judicial estoppel means that Defendants will not be heard to contradict themselves on the matter of whether a successor-in-interest relationship exists in the first place, Defendants remain free to argue—and have indeed vigorously argued—that the particular relationship here does not support the extension of personal jurisdiction over Koehler Paper.  The court finds unpersuasive that latter argument for the non-estoppel-related reasons set forth below.  See infra Section II.C.

representations in the 2021 Summons.  For example, they argue that the Government cannot allege

that "there is successor liability because it also alleged that Koehler Oberkirch <u>still exists</u>, and if

the alleged predecessor 'still exists,' 'there is no successor, and therefore, no successor liability.'"

Defs.' Reply at 4 (quoting <u>Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.</u>, 153 F. Supp. 3d 778,

807 (W.D. Pa. 2015)).  Does Koehler Oberkirch's continued existence mean that Koehler Paper is

not after all "the successor-in-interest to a participant in the investigation that gave rise to the

contested determination" in the <u>Matra</u> litigation?  2021 Summons at 1.  Did Koehler Paper

"therefore [lack] standing to commence [that] action"?  <u>Id.</u>  The Government should not bear the

burden of exploring the range of these apparent contradictions for the narrow purpose of opposing

Defendants' Motion to Dismiss in this action.  But neither should the court, by ignoring them, risk

"creat[ing] the perception that either the first or the second court was misled."  <u>New Hampshire v.</u>

<u>Maine</u>, 532 U.S. at 750 (internal quotation marks and citation omitted).  Judicial estoppel—which

the court may invoke "at its discretion"—is the simpler and fairer path.  <u>Id.</u> (internal quotation

marks and citation omitted).

In any event, the allegations in the Complaint amount to a "prima facie showing,"

<u>LABOKLIN</u>, 933 F.3d at 1309, that Koehler Paper is Koehler Oberkirch's successor in interest

for the purpose of antidumping duty liability.  The Government alleges that:

> [T]he defendants (1) concealed the full amount of Koehler's debts to Customs from
> their financial statements; (2) shared the same officers and directors at the time of
> the "spin-off"; (3) conducted the "spin-off" a few months after Koehler's debts to
> Customs became final and conclusive by law; (4) transferred over three-quarters of
> Koehler's assets to Koehler Paper SE without an equivalent transfer of liabilities or
> provisions; and (5) left Koehler with insufficient assets to pay its debts to Customs.

Compl. ¶ 50.  "Because the 'spin-off' was motivated by the intent to defraud Customs," the

Government further alleges, "Koehler Paper SE is liable for Koehler's debts to Customs as

Koehler's successor-in-interest."  Compl. ¶ 51.

These allegations facially support[10] the notion that Koehler Paper is Koehler Oberkirch's successor in interest as to Koehler Oberkirch's antidumping duty liability.  The court has held that under "the majority rule on successor liability," fraud against a creditor is one of the bases for imputing a debt to a successor entity.  United States v. Ataka Am., Inc., 17 CIT 598, 600, 826 F. Supp. 495, 498 (1993).  "[A] corporate successor is responsible for its predecessor's debts" if (inter alia) "the change in corporate form was motivated by the intent to defraud creditors."  Id.; see also United States v. Sterling Footwear, Inc., 41 CIT __, __, 279 F. Supp. 3d 1113, 1140–41 (2017).  And as the Supreme Court explained long ago, "[t]he properties of a corporation constitute a trust fund for the payment of its debts; and, when there is a misappropriation of the funds of a corporation, equity, on behalf of the creditors of such corporation, will follow the funds so diverted."  Chicago, Milwaukee & St. Paul Ry. Co. v. Third Nat'l Bank, 134 U.S. 276, 287 (1890); see also New Colonial Ice Co. v. Helvering, 292 U.S. 435, 442 (1934) (explaining somewhat more recently that the rule of corporate separateness "is subject to the qualification that the separate identity may be disregarded in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights").  The Bankruptcy Code further illustrates this principle of creditor protection, empowering a trustee to "avoid" a transfer of assets

---

[10] At this procedural juncture, Defendants challenge only the notion that the Government's allegations support a valid legal basis for personal jurisdiction.  They do not actively dispute the alleged jurisdictional facts themselves, and attempt instead to reserve such a challenge for a future stage of litigation.  See Defs.' Reply at 6 ("Though for purposes of a motion to dismiss, the court must accept all well-pleaded allegations, the facts will show that the creation of Koehler Paper was not for the purpose of Koehler Oberkirch's avoidance of liability."); see also Oral Arg. at 5:51–6:37 (statements of John F. Wood), available at https://www[.]cit.uscourts[.]gov/audio-recordings-select-public-court-proceedings.

Court No. 24-00014                                                                     Page 21

that is made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or

became, on or after the date that such transfer was made or such obligation was incurred,

indebted . . . ." 11 U.S.C. § 548(a)(1)(A).

The court sees no reason to depart from this settled principle here.  In applying it, the court

does not address whether the Government will end up demonstrating its entitlement to recover

from Koehler Paper—whether on the basis of fraud or on any other theory of successor liability.

That question is beyond the scope of the jurisdictional inquiry that Defendants have framed for the

court's consideration.[11]  For now, it is enough to observe that the Government's allegations amount

to a prima facie showing of a fraudulently-motivated corporate spin-off.  This in turn establishes

as a facial matter that Koehler Paper is Koehler Oberkirch's successor in interest as to the

antidumping duty liability incurred by Papierfabrik August Koehler AG (that is, Koehler

Oberkirch).

### C.    *The Alleged Successor-in-Interest Relationship Supports Imputing Personal Jurisdiction from Koehler Oberkirch to Koehler Paper.*

The court next turns to the Government's attempt to synthesize its showings that (1)

Koehler Oberkirch uncontestedly has minimum jurisdictional contacts with the United States and

that (2) Koehler Paper is Koehler Oberkirch's successor in interest.  According to the Government,

"[t]hose two points, put together, are fatal to Koehler Paper's argument that this Court lacks

personal jurisdiction over it."  Pl.'s Resp. at 8.  The Government cites cases, from the U.S. Courts

of Appeals for the Fourth, Fifth, Sixth, Seventh, and Tenth Circuits, that with only slight variation

---

[11] By the same token, the court's holding that personal jurisdiction lies on account of fraud-based successor jurisdiction—which is limited by the jurisprudential point that one ground for denying the Motion to Dismiss is enough—does not necessarily bar recovery on any other ground of successor liability that the Government may be able to establish at the merits stage of litigation.

state the general principle that "the jurisdictional contacts of a predecessor corporation may be imputed to its successor corporation without offending due process." <u>Purdue Research Found. v. Sanofi-Synthelabo, S.A.</u>, 338 F.3d 773, 783 (7th Cir. 2003); <u>see also</u> Pl.'s Resp. at 8–9 (citing <u>Hawkins v. i-TV Digitalis Tavkozlesi zrt.</u>, 935 F.3d 211, 227 (4th Cir. 2019); <u>Patin v. Thoroughbred Power Boats Inc.</u>, 294 F.3d 640, 653 (5th Cir. 2002); <u>Est. of Thomson ex rel. Est. of Rakestraw v. Toyota Motor Corp. Worldwide</u>, 545 F.3d 357, 362 (6th Cir. 2008); and <u>Williams v. Bowman Livestock Equip. Co.</u>, 927 F.2d 1128, 1131 (10th Cir. 1991)).  The Government also cites <u>Minnesota Mining and Manufacturing Co. v. Eco Chem, Inc.</u>, in which the Federal Circuit held that "[w]hen the successor in interest voluntarily steps into the shoes of its predecessor, it assumes the obligations of the predecessor's pending litigation if the court properly assumed jurisdiction over the predecessor and if the successor is properly served . . . ."  757 F.2d 1256, 1263 (Fed. Cir. 1985) (addressing the imputation of jurisdictional contacts in the context of party substitution pursuant to Federal Rule of Civil Procedure 25(c)).

Defendants argue that these authorities do not support the Government's particular fraud-based theory of jurisdiction as to Koehler Paper.  Although "[t]he Government appears to base its arguments in the Response for successor in interest jurisdiction on cases relying on either a 'mere continuation' or 'de facto merger' standard," they argue, "there is no allegation in the Amended Complaint supporting the notion that Koehler Paper has 'entirely stepped into the shoes' of Koehler Oberkirch to meet either of those tests."  Defs.' Reply at 3–4.  According to Defendants, "[n]one of [the Government's] allegations relate to any activity by Koehler Paper in the United States."  Mot. to Dismiss at 5.  Regardless of the "potential inequities that [might] result from a finding of an absence of personal jurisdiction," they further argue, "concerns about the logistics of

recouping a judgment do not create the minimum contacts necessary to comport with the Constitution." Defs.' OAQ Resp. at 5 (citation omitted). Defendants also raise a concern that exercising personal jurisdiction over Koehler Paper would offend international comity. Defs.' Reply at 4–5 (first citing Hawkins, 935 F.4th at 230–32, and then citing SEC v. Gastauer, 93 F.4th 1, 13 (1st Cir. 2024)).

The kernel of Defendants' due-process argument is that cases like Purdue describe a closed universe of scenarios in which an entity that succeeds to its predecessor's liabilities will also succeed to that predecessor's jurisdictional contacts. In Defendants' view, this happens only where a corporate restructuring fails in some categorized way to cleave a successor from its predecessor; other uncategorized bases for successor liability, such as fraud, do not permit imputing personal jurisdiction from predecessor to successor.

Defendants propose a distinction without a difference. As the Fourth Circuit has observed, "[t]he great weight of persuasive authority permits imputation of a predecessor's actions upon its successor whenever forum law would hold the successor liable for its predecessor's actions." City of Richmond v. Madison Mgmt. Grp., 918 F.2d 438, 454 (4th Cir. 1990) (emphasis in original) (internal quotation marks and citations omitted) (collecting cases). The Tenth Circuit has stated the same principle in similarly general terms: "A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor." Williams, 927 F.2d at 1132; accord Patin, 294 F.3d at 653 ("[I]t is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal

jurisdiction in that court." (emphasis added)).  None of these authorities suggests a limitation of successor jurisdiction to certain defined sub-categories of successor liability.[12]  Nor does the court see a reason to hold what these authorities did not: that each sub-category warrants separate treatment as an island with endemic jurisdictional characteristics.  Cf. Brandon v. Anesthesia & Pain Mgmt. Assocs., 419 F.3d 594, 599 (7th Cir. 2005) ("It doesn't matter whether we call St. Clair APM's continuation, or APM's alter ego (the same corporation, just with a different name), or a fraudulent shield interposed between Brandon's claim and the defendants' assets.  Under any of these formulations, Brandon is entitled to ignore the formation of St. Clair and treat its assets as if they were APM's." (citations omitted)).

It is Defendants' burden to overcome the "great weight of persuasive authority," City of Richmond, 918 F.2d at 454, to establish that imputing Koehler Oberkirch's jurisdictional contacts to its successor in interest "would be constitutionally unreasonable." 3D Sys., Inc. v. Aarotech Lab'ys, Inc., 160 F.3d 1373, 1379 (Fed. Cir. 1998).  They do not accomplish this by simply pointing out that certain prior articulations of the successor-jurisdiction principle have appeared in cases involving non-fraud bases of successor liability.  See Defs.' Reply at 3–4.  If this factual distinction means that the reasoning adopted in Purdue and related cases loses its persuasive force with respect to the alleged fraudulently-motivated conduct here, Defendants do not explain why. Cf. Moore v. Off. of Pers. Mgmt., 113 F.3d 216, 218 (Fed. Cir. 1997) ("Although Wassenaar can

---

[12] The Second Circuit recognized in U.S. Bank National Ass'n v. Bank of America N.A. that under New York law, "whether liability as a successor in interest also entails being subject to personal jurisdiction where the actions of the predecessor would have made the predecessor subject—depends on the basis of the successor liability."  916 F.3d 143, 156 (2d Cir. 2019).  But even under what seems to be New York's relatively narrow approach, fraud counts among the bases for successor liability that gives rise to successor jurisdiction.  See Lelchook v. Société Générale de Banque au Liban SAL, 67 F.4th 69, 79 & n.14 (2d Cir. 2023).

be distinguished on its facts on the ground adopted by the Board . . . the analysis that the court employed in <u>Wassenaar</u> dictates a similar result here.").

Nor would such an explanation take Defendants very far.  On a basic level, accepting Defendants' argument would create a fraud exception to the general rule that successor liability begets successor jurisdiction.  This exception would reward the very mischief that the rule exists to stamp out.  As the Federal Circuit explained in <u>Minnesota Mining</u>, successor jurisdiction prevents a scenario where "the owners of the property could merely transfer legal ownership of the assets from one shell corporation to another in a different jurisdiction, putting a party whose initial suit satisfied the jurisdictional requirements to the immense burden of chasing the involved assets from courtroom to courtroom."  757 F.2d at 1263.[13]

As Defendants would have it, this conduct would defeat jurisdiction so long as the transfers in question, rather than satisfying the precise elements of a facially legitimate mere continuation or de facto merger, are fraudulent.  This would entail that "mere continuation" that "amount[s] to fraud" supports personal jurisdiction but that conduct that is actually fraudulent does not.  15 William Meade Fletcher et al., <u>Cyclopedia of the Law of Corporations</u> § 7124.10 (Sept. 2024 Update).  Such a paradoxical result would not just elevate form over substance; it would invert the very substantive consideration that form is supposed to reflect.

On a basic level, exercising successor jurisdiction over Koehler Paper satisfies the

---

[13] The Federal Circuit frowned on an analogous pattern of jurisdiction-avoidant behavior in <u>Dainippon Screen Manufacturing Co. v. CFMT, Inc.</u>, bestowing a "chutzpah award[]" on a party's suggestion "that a parent company can incorporate a holding company in another state, transfer its patents to the holding company, arrange to have those patents licensed back to itself by virtue of its complete control over the holding company, and threaten its competitors with infringement without fear of being a declaratory judgment defendant."  142 F.3d 1266, 1271 (Fed. Cir. 1998).

due-process requirement that "the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).  Koehler Paper is not alleged to be a passive "relief defendant [that] is not accused of any wrongdoing and 'is part of a suit only as the holder of assets that must be recovered in order to afford complete relief.'" Gastauer, 93 F.4th at 12 (quoting CFTC v. Kimberlynn Creek Ranch, Inc., 276 F.3d 187, 192 (4th Cir. 2002)).  Koehler Oberkirch, for one thing, is Koehler Paper's "wholly-owned subsidiary."  2021 Summons at 1 n.1.

Nor do the Government's allegations suggest that Koehler Paper's "only involvement in the case is [its] receipt of a unilateral transfer of money from a third party." Id.  To the contrary. The Government alleges that Koehler Paper intentionally participated in a corporate restructuring and subsequent transfer that were "motivated by the intent to defraud Customs" in order to avoid paying a delinquent balance of antidumping duties owed to the United States.  Compl. ¶ 51; see 19 U.S.C. § 1505(b), (d).  Both Defendants allegedly "concealed the full amount of Koehler's debts to Customs from their financial statements," among other acts, in carrying out the transfer. Id. ¶ 50.  These actions may have taken place in Germany and involved mechanisms of German corporate law, but all due process requires is that Defendants' "intentional, and allegedly tortious, actions were expressly aimed at" the forum—which here is the United States. Calder v. Jones, 465 U.S. 783, 789 (1984).[14]

---

[14] For the same reason, Defendants' international comity concern is misplaced.  The concern is valid in a general sense: "permitt[ing] the exercise of personal jurisdiction over foreign nonparties based on purely foreign conduct" may indeed cause other nations to "look askance." Hawkins, 935 F.3d at 231; see Defs.' Reply at 5.  But as the court has already explained, Koehler Paper's alleged conduct is not "purely foreign"; it pertains directly to a debt that is a creation of United States law and is owed to the United States.  This conduct allegedly targets the United States as both a forum and a judgment creditor. Hawkins involved a starkly different set of facts: the

That requirement is satisfied here, notwithstanding the fact that "the alleged 'fraud' took place in a foreign country."  Defs.' Post-Arg. Submission at 3.  Koehler Paper allegedly targeted the United States when it (1) voluntarily assumed, as a successor in interest, the antidumping duty liability that Koehler Oberkirch uncontestedly incurred by importing thermal paper and (2) aimed to defraud a U.S. judgment creditor (indeed, the United States itself) by participating in the "spin-off."  Compl. ¶ 51; see United States v. Islip, 22 CIT 852, 868, 18 F. Supp. 2d 1047, 1061 (1998) ("As long as Defendant purposefully directed his actions toward the forum state, it does not matter where those actions were taken."); see also Purdue, 338 F.3d at 784 ("In the corporate successor context, the successor corporation has chosen to stand in the shoes of its predecessor and has chosen to accept the business expectations of those who have dealt previously with that predecessor.  Therefore, it can be expected to be haled into the same courts as its predecessor.").

To put this all in other terms, the Federal Circuit's Synthes factors support the extension of fraud-based successor jurisdiction over Koehler Paper.  See 563 F.3d at 1297.  These factors are "whether (1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to the defendant's activities with the forum, and (3) assertion of personal jurisdiction is reasonable and fair."  Id.  As to the first factor, the Government's allegations that Koehler Paper (a) attempted to defraud the United States through the "spin-off," and (b) willingly took on Koehler Oberkirch's assets and liabilities, describe a purposeful direction

---

acquisition by a group of overseas persons of Hungarian corporate assets that lacked "any real in-forum effect." 935 F.3d at 230. "Nothing in the record," the Fourth Circuit explained, "suggests that the Respondents . . . aimed their conduct at Virginia or, more broadly, the United States as a whole." Id. at 231; see also Gastauer, 93 F.4th at 11 ("The SEC . . . characterize[es] Gastauer as a sort of successor in interest to his son with respect to the fraudulent funds.  But it offers no definition of what constitutes a successor in interest, nor does it provide any explanation as to why Gastauer would meet that definition . . . .").

of activities toward the United States.  As to the second factor, Koehler Paper's alleged activities

relate to the very heart of the Government's claim under 28 U.S.C. § 1582(3) for the recovery of

customs duties.  The "spin-off" in which Koehler Paper participated, the Government alleges, was

a device to prevent recovery of those duties.  See Compl. ¶ 50.  And as to the third Synthes factor,

it is most reasonable and fair to extend jurisdiction over a successor in interest that allegedly

employs fraud to "voluntarily step[] into the shoes of its predecessor."  Minn. Mining, 757 F.2d at

1263.  If this court's exclusive jurisdiction did not lie in such a circumstance, any corporate

judgment debtor could easily thwart the United States's efforts to obtain trade remedies adjudged

to be afforded by U.S. law.  That is not what fairness demands.  "[T]he Due Process Clause," the

Supreme Court has instructed, "may not readily be wielded as a territorial shield to avoid interstate

obligations that have been voluntarily assumed."  Burger King Corp. v. Rudzewicz, 471 U.S. 462,

474 (1985).

***

The court need go no further.  As the Government's showing in support of its primary

successor-jurisdiction theory defeats the USCIT Rule 12(b)(2) prong of Defendants' Motion to

Dismiss, the court declines at this stage to consider whether personal jurisdiction might also lie on

the Government's alternative theory of Koehler Paper's consent through participation in the Matra

litigation.  See Pl.'s Resp. at 11–12.  The successor-jurisdiction theory is a "sufficient ground for

deciding this case, and the cardinal principle of judicial restraint—if it is not necessary to decide

more, it is necessary not to decide more—counsels [the court] to go no further."  Miller v. Metro.

Life Ins. Co., 979 F.3d 118, 124 (2d Cir. 2020) (internal quotation marks and citation omitted).  If

at some future stage it becomes necessary to decide the consent issue that the Government raises,

Court No. 24-00014                                                                    Page 29

the court will do so without the need for further briefing on the underlying substantive question.

## CONCLUSION

Defendants are not entitled to dismissal on either of the grounds they assert.   Their defense of insufficient service of process is unsupported by any new argumentation, and the alleged jurisdictional contacts of both Koehler Oberkirch and Koehler Paper overcome their defense of lack of personal jurisdiction.   <u>See</u> USCIT R. 12(b)(2), (5).   For these reasons, it is hereby

**ORDERED** that Defendants' Motion to Dismiss, Oct. 24, 2024, ECF No. 43, is **DENIED**.


/s/       *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: <u>March 27, 2025</u>
        New York, New York