UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: GARY S. KATZMANN, JUDGE

| | |
|---|---|
| UNITED STATES, | : |
| Plaintiff, | : |
| v. | : |
| | :  Court No. 24-00014 |
| KOEHLER OBERKIRCH GMBH, f/k/a PAPIERFABRIK AUGUST KOEHLER SE, f/k/a PAPIERFABRIK AUGUST KOEHLER AG; and KOEHLER PAPER SE, | : |
| Defendants. | : |

## <u>ORDER</u>

Upon consideration of plaintiff's motion for default judgment, and upon consideration of all other papers and proceedings had herein; it is hereby

**ORDERED** that plaintiff's motion is granted;

**ORDERED** that judgment is entered in favor of plaintiff and against defendants Koehler Oberkirch GmbH and Koehler Paper SE, jointly and severally, in the amount of $193,631,642.08, plus post-liquidation interest under 19 U.S.C. § 1505(d), plus post-judgment interest under 28 U.S.C. § 1961;

**ORDERED** that Koehler Oberkirch GmbH, Koehler Paper SE, any of its officers, agents, servants, employees, attorneys, or any other person in active concert or participation with any one of the foregoing, who has received actual notice of this order, are hereby **ENJOINED** from importing or causing to be imported into the United States, directly or indirectly by or on behalf of a third party, any merchandise produced or sold by Koehler Oberkirch GmbH or Koehler

Paper SE (the "Enjoined Merchandise"), until such time that the Court finds that the foregoing money judgment has been paid; and it is further

**ORDERED** that plaintiff, through U.S. Customs and Border Protection, is authorized to exclude the Enjoined Merchandise from entry into the United States. To facilitate the enforcement of this injunction, U.S. Customs and Border Protection is further authorized to publish notice of this order to the public and to require information or documentation from the entry filer, its licensed customs broker, or other appropriate party, regarding whether an importation, entry, or attempted importation or entry includes the Enjoined Merchandise.

_____
Judge

Dated: _____
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: GARY S. KATZMANN, JUDGE

—————————————————————————
                                          :
UNITED STATES,                            :
                                          :
                     Plaintiff,           :
                                          :
          v.                              :
                                          :        Court No. 24-00014
KOEHLER OBERKIRCH GMBH, f/k/a             :
PAPIERFABRIK AUGUST KOEHLER               :
SE, f/k/a PAPIERFABRIK AUGUST             :
KOEHLER AG; and KOEHLER PAPER             :
SE,                                       :
                                          :
                     Defendants.          :
—————————————————————————:

## **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

                              BRETT A. SHUMATE
                              Assistant Attorney General

                              PATRICIA M. McCARTHY
                              Director

                              JUSTIN R. MILLER
                              Attorney-In-Charge
                              International Trade Field Office

Of Counsel:
BRANDON T. ROGERS            EDWARD F. KENNY
LISA ROSS                    Senior Trial Counsel
ALEXANDRA KHREBTUKOVA        Department of Justice, Civil Division
U.S. Customs and Border Protection    Commercial Litigation Branch
Office of Chief Counsel      26 Federal Plaza, Suite 346
                             New York, New York 10278
                             Tel.: (212) 264-9236
Dated: February 9, 2026      *Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

BACKGROUND ................................................................................................................. 2

    I.    The Parties Exchange Initial Disclosures, and the Government Serves Discovery Requests ........................................................................................................................... 2

    II.    The Defendants Respond to the Government's Discovery Requests by Refusing to Participate in Discovery ......................................................................................................... 3

SUMMARY OF ARGUMENT ............................................................................................ 4

ARGUMENT ...................................................................................................................... 5

    I.    The Court Should Enter Default Judgment Against the Defendants Because They Refuse to Participate in Discovery Without Raising any Viable Objections ........................................ 5

        A.    The Defendants Have Willfully Defaulted and Have Not Raised Any Meritorious Objection to Discovery Under Foreign Law ........................................................................ 6

        B.    The Balance of Interests Weigh Decisively in Favor of Applying U.S. Law Over Foreign Law .................................................................................................................. 8

    II.    The Defendants are Jointly and Severally Liable to the Government for the Unpaid Antidumping Duties, Plus Pre- and Post-Judgment Interest ................................................... 11

        A.    Koehler Oberkirch GmbH and Koehler Paper SE are Both Liable for the $193,631,642.08 Debt .................................................................................................... 12

        B.    The Defendants' Objections to the Debt are Meritless ................................................. 15

    III.    The Court Should Enjoin the Defendants from Importing Merchandise into, or Exporting Merchandise from, the United States, or Causing Merchandise to be Imported or Exported by or on Behalf of a Third Party, Until they Pay the Antidumping Duties and Interest they Owe ................................................................................................................... 16

        A.    The Court Has the Authority to Enter the Government's Requested Injunction .......... 17

        B.    In Light of the Defendants' Refusal to Pay its Massive Duty Liability, Undermining of the Antidumping Laws, and Flouting of this Court's Judgments, the Government's Requested Injunction is Warranted ....................................................................................... 22

CONCLUSION .................................................................................................................. 26

# TABLE OF AUTHORITIES

Cases

*Akro Corp. v. Luker*,
45 F.3d 1541 (Fed. Cir. 1995) ............................................................................................. 9

*Am. Rivers v. Army Corps of Eng'rs*,
274 F. Supp. 2d 62 (D.D.C. 2003) ........................................................................................ 1

*AnywhereCommerce, Inc. v. Ingenico, Inc.*,
2020 WL 5947735 (D. Mass. Aug. 31, 2020) ...................................................................... 10

*Arigna Tech. Ltd. v. Nissan Motor Co., Ltd.*,
2022 WL 3020136 (E.D. Tex. July 29, 2022) ....................................................................... 8

*Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
268 F.3d 103 (2d Cir. 2001) ................................................................................................. 23

*BrightEdge Techs., Inc. v. Searchmetrics, GmbH*,
2014 WL 3965062 (N.D. Cal. Aug. 13, 2014) ...................................................................... 9

*Brown v. Coates*,
253 F.2d 36 (D.C. Cir. 1958) ................................................................................................ 21

*Company of Stationers*,
22 Eng. Rep.854 (1681) ......................................................................................................... 19

*Drone Techs., Inc. v. Parrot S.A.*,
838 F.3d 1283 (Fed. Cir. 2016) ......................................................................................... 6, 7

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ............................................................................................................... 22

*Fairfield Sentry Ltd. v. HSBC Securities Servs. (Luxembourg) S.A.*,
2022 WL 3910679 (S.D.N.Y. Aug. 31, 2022) ....................................................................... 7

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) ......................................................................................................... 20, 22

*Fuld v. Palestine Liberation Org.*,
145 S. Ct. 2090 (2025) ............................................................................................................ 9

*Glock, Inc. v. United States*,
736 F. Supp. 3d 1279 (Ct. Int'l Trade 2024) ....................................................................... 10

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ........................................................................................ 18

*In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*,
2020 WL 14025674 (S.D. Fla. June 3, 2020) ...................................... 8, 10

*In re Mercedes-Benz Emissions Litig.*,
2020 WL 487288 (D.N.J. Jan. 30, 2020) ........................................ 8, 9, 10

*Int'l Custom Prods., Inc. v. United States*,
791 F.3d 1329 (Fed. Cir. 2015) ...................................................................... 24

*Knight Cap. Partners Corp. v. Henkel AG & Co.*,
290 F. Supp. 3d 681 (E.D. Mich. 2017) .......................................................... 8

*Maryland v. King*,
567 U.S. 1301 (2012) ...................................................................................... 24

*Matra Americas, LLC v. United States*,
681 F. Supp. 3d 1339 (Ct. Int'l Trade 2024) ................................................... 5

*Minnesota Min. & Mfg. Co. v. Eco Chem, Inc.*,
757 F.2d 1256 (Fed. Cir. 1985) ............................................................ 5, 6, 11

*Motorola Credit Corp. v. Uzan*,
2003 WL 21373463 (S.D.N.Y. June 12, 2003) ............................................. 23

*Nat'l Hockey League v. Metro. Hockey Club*,
427 U.S. 639 (1976) ......................................................................................... 6

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .................................................................................... 23

*NML Capital, Ltd. v. Republic of Argentina*,
699 F.3d 246 (2d Cir. 2012) ..................................................................... 22, 23

*Oman Fasteners, LLC v. United States*,
125 F.4th 1068 (Fed. Cir. 2025) ................................................................... 22

*Regal Knitwear Co. v. NLRB*,
324 U.S. 9 (1945) ........................................................................................... 25

*Rinaldi v. NICE*,
2020 WL 4340640 (S.D.N.Y. July 27, 2020) .................................................. 7

*Societe Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*,
482 U.S. 522 (1987) ...................................................................................... 7,

*State Farm Mut. Auto. Ins. Co. v. Am. Rehab & Physical Therapy, Inc.*,
376 F. App'x 182 (3d Cir. 2010) ........................................................................ 23, 24

*Sys. Div., Inc. v. Teknek Elecs., Ltd.*,
253 F. App'x 31 (Fed. Cir. 2007) ............................................................................. 13

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ............................................................................... 18, 19, 20

*United States v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) .................................................................................................. 25

*United States v. Koehler Oberkirch GmbH*,
776 F.Supp.3d 1226 (2025) ............................................................................ 2, 9, 13

*United Constr. Prods., Inc. v. Tile Tech, Inc.*,
843 F.3d 1363 (Fed. Cir. 2016) ............................................................................. 6, 7

*United States v. Adaptive MicroSystems, LLC*,
914 F. Supp. 2d 1331 (Ct. Int'l Trade 2013) ........................................................... 14

*United States v. Am. Home Assurance Co.*,
857 F.3d 1329 (Fed. Cir. 2017) ............................................................................... 16

*United States v. Bausch & Lomb Optical Co.*,
321 U.S. 707 (1944) ........................................................................................... 20, 21

*United States v. Cherry Hill Textiles, Inc.*,
112 F.3d 1550 (Fed. Cir. 1997) ............................................................................... 16

*United States v. Columbia Pictures Indus., Inc.*,
507 F. Supp. 412 (S.D.N.Y. 1980) ...................................................................... 24, 25

*United States v. E.G. Plastics, Inc.*,
494 F. Supp. 3d 1361 (Ct. Int'l Trade 2021) ........................................................... 11

*United States v. Gold Mountain Coffee, Ltd.*,
597 F. Supp. 510 (Ct. Int'l Trade 1984) ............................................................. 17, 18

*United States v. Great Am. Ins. Co.*,
738 F.3d 1320 (Fed. Cir. 2013) ............................................................................... 13

*United States v. Ivaco, Inc.*,
704 F. Supp. 1409 (W.D. Mich. 1989) ..................................................................... 24

*United States v. Neman Bros. & Assocs.*,
18 C.I.T. 89 (1994) ..................................................................................................... 6

*United States v. Pansier*,
2022 WL 2829759 (7th Cir. July 20, 2022) .......................................................... 16

*United States v. Sterling Footwear, Inc.*,
279 F. Supp. 3d 1113 (Ct. Int'l Trade 2017) ......................................................... 13

*United States v. Trib. Publ'g Co.*,
2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) ...................................................... 24

*Wright v. E-Systems, LLC*,
2016 WL 7802996 (N.D. Tex. Dec. 20, 2016) ...................................................... 12

**Statutes**

19 U.S.C. § 1505(d) ............................................................................... 13, 14, 15, 16

19 U.S.C. § 1509 ............................................................................................. 17, 18

19 U.S.C. § 1510 .................................................................................................. 17

19 U.S.C. § 1514(a) ........................................................................................ 12, 16

19 U.S.C. § 1677g ..................................................................................... 12, 14, 16

28 U.S.C. § 1585 .................................................................................................. 18

28 U.S.C. § 1961 ....................................................................................... 13, 14, 16

28 U.S.C. § 2643 (c)(1) ........................................................................................ 18

**Rules**

USCIT Rule 1 .......................................................................................................... 6

USCIT Rule 33(b)(4) ............................................................................................... 7

USCIT Rule 34 (b)(2)(B) ......................................................................................... 7

USCIT Rule 37 ........................................................................................................ 6

USCIT Rule 37 (b)(2)(A)(iii) ................................................................................. 12

USCIT Rule 37(d) ................................................................................................ 5, 6

USCIT Rule 37(d)(1)(A)(ii) .................................................................................... 5

USCIT Rule 37(d)(1)(B) ......................................................................................... 4

USCIT Rule 65(d)...............................................................................................................25

**Other Authorities**

H. Tomás Gómez-Arostegui, *What History Teaches Us About Copyright Injunctions and the Inadequate-Remedy-At-Law Requirement*,
81 S. Cal. L. Rev. 1197, 1241 & nn.227–28 (2008) ...................................................... 19

James A. Kohn, *The Antidumping Act: Its Administration and Place in American Trade Policy*,
60 Mich. L. Rev. 407, 413 (1962)................................................................................ 21

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: GARY S. KATZMANN, JUDGE

---

| | |
|---|---|
| UNITED STATES, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : Court No. 24-00014 |
| KOEHLER OBERKIRCH GMBH, f/k/a | : |
| PAPIERFABRIK AUGUST KOEHLER | : |
| SE, f/k/a PAPIERFABRIK AUGUST | : |
| KOEHLER AG; and KOEHLER PAPER | : |
| SE, | : |
| | : |
| Defendants. | : |

---

## **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

Pursuant to Rule 37 of the United States Court of International Trade, and the law cited herein, the United States respectfully moves for default judgment as against defendants Koehler Oberkirch GMBH, f/k/a Papierfabrik August Koehler SE, f/k/a Papierfabrik August Koehler AG; and Koehler Paper SE.

On two occasions, the United States has propounded discovery request to defendants. Each time, however, the defendants raised no valid objections to the Government's requests and stated that they refuse to participate in the discovery phase of this case. Default judgment is appropriate at this stage of the proceedings because, as we discuss below, defendants have indicated that a motion to compel would be fruitless and have recommended that the Government file a motion for default judgment.

"If the rule of law is to be upheld, it is essential that the judiciary takes firm action to vindicate its authority and to compel compliance with lawfully issued directives." *Am. Rivers v. Army Corps of Eng'rs*, 274 F. Supp. 2d 62, 70 (D.D.C. 2003). Because the defendants have

failed to abide by this Court's judgments or rules, and because they have raised no valid objections to the Government's discovery requests, the sanction of default judgment is warranted.

Moreover, the defendants have made equally clear that they will refuse to pay their outstanding liabilities to the United States or even identify domestic assets that could satisfy that judgment. As such, in this rare circumstance, the proposed injunctive relief is warranted: an order enjoining the entering of defendants' merchandise into the U.S. market, by prohibiting them from importing merchandise here, and from causing another party to do so, until they pay the judgment. No other remedy would effectively enforce this Court's judgments, protect the rule of law, and ensure the fairness of our markets.

## **BACKGROUND**

### I.     **The Parties Exchange Initial Disclosures, and the Government Serves Discovery Requests**

The Court is familiar with the factual and procedural background of this matter. *See Koehler*, 776 F. Supp. 3d at 1231–34. After the Court denied the defendants' motion to dismiss, the defendants answered the amended complaint, the Court entered an agreed scheduling order, and the parties exchanged initial disclosures. Exs. 1 and 2. The defendants identified their "[r]epresentatives, employees, and agents" as likely having discoverable information concerning the Government's allegations and the defendants' ability to pay, among other matters. Defs.' Initial Disclosures, Ex. 1. The defendants also identified various categories of discoverable documents in their possession, including "[f]inancial records," "[d]ocuments regarding" the "spin-off," and "[d]ocuments regarding" the defendants' "ability to pay any" judgment. *Id.* The Government provided a declaration from Bruce Ingalls, the Director of the Revenue Division at Customs' Office of Finance, which detailed the extent of the defendants' debt and provided over

1,500-pages worth of supporting documentation, including spreadsheets of data compiled from Customs' Automated Commercial Environment and copies of bills issued to the defendants' predecessor.  Pl.'s Initial Disclosures, Ex. 2; *see* Ingalls Decl., Ex. 3 (Attachments A–K, GOV000001–GOV001510).  The Government also reproduced the financial statements referenced in the amended complaint.  Ex. 4 (GOV001511–GOV001645).

After the parties exchanged initial disclosures, the Government issued interrogatories, requests for production, and requests for admission to the defendants.  Interrogatories, Ex. 5; Requests for Production, Ex. 6; First Requests for Admission, Ex. 7.  The requests sought basic information, including the documents referenced in the defendants' initial disclosures, and asked the defendants to identify assets held in the United States.  *See id.*  The requests also sought information concerning the defendants' "spin off," including the identities of those in charge of each company, the reasons for conducting the "spin off," the documents memorializing the transaction, and a list of the assets and liabilities transferred.  *See id.*

## II.    The Defendants Respond to the Government's Discovery Requests by Refusing to Participate in Discovery

Thirty days after the Government served its first discovery requests, the defendants responded by stating that "upon careful consideration, the Koehler entities will not respond to these discovery requests and will not participate in any future discovery in this case."  Defs.' First Letter, Ex. 8 at 1.  The defendants did not raise any specific objections to any of the Government's discovery requests; rather, they broadly gestured toward "due regard for German sovereignty and German law, the European Union's General Data Privacy Regulation (GDPR), and international comity."  *Id.*  But nowhere in their letter did the defendants state that they were prohibited from responding to any of the Government's discovery requests—including requests as simple as reproducing or admitting publicly disclosed information—due to foreign law or any

3

other reason.  Instead, the defendants suggested that "U.S.-style discovery" would pose

unspecified "insurmountable challenges for German companies with German employees,

especially with respect to the GDPR."  *Id.*

      After conferring with the defendants, the Government issued one more round of requests

for admission.  Second Requests for Admission, Ex. 9.  These requests merely sought to

establish the defendants' liability through deemed admissions if they again refused to answer.

*See id.*  After thirty days, the defendants replied: "For the reasons set forth in" the first letter, the

defendants "will not respond to the Government's discovery requests."  Defs.' Second Letter,

Ex. 10 at 1.  The defendants reiterated their belief that "compliance with at least some of the

Government's discovery requests" (whichever requests those might be) "would be inconsistent

with" their still unidentified "obligations under German law and the" GDPR.  *Id.* at 2.

      The Government acknowledges that it "has in good faith conferred" with the defendants

"in an effort to obtain" responses to the Government's discovery requests "without court action."

USCIT Rule 37(d)(1)(B).  That telephone conference was unsuccessful.  The defendants

suggested that the Government  "simply move for judgment on the pleadings or default

judgment, rather than force the parties and Court to devote unnecessary time and resources

litigating a motion to compel."  Ex. 10 at 2.

## SUMMARY OF ARGUMENT

      Through their responses to the Government's discovery requests, the defendants have

made their willful default clear.  They "will not respond to" the Government's discovery requests

"and will not participate in any future discovery in this case."  And their general objections

regarding foreign law are both waived and unavailing.  Accordingly, the Court need not engage

in the pointless exercise of first compelling the defendants to respond.  The Court can, and should, impose the sanction of default judgment against the defendants now.

As part of that judgment, the Court should also enjoin the defendants from participating in the U.S. market by prohibiting their merchandise from entry, whether imported directly by the defendants or indirectly through a third party, until they pay the antidumping duties and interest they owe.  The defendants have made clear that they will not pay any money judgment issued by this Court—they are refusing to participate in this case and have not paid any of their bills resulting from this Court's judgments upholding the antidumping duties in the first place. Indeed, the defendants continue to actively end-run this Court's judgments, and the remedy the antidumping duties upheld by those judgments were statutorily intended to provide, by altering their business model to continue to sell merchandise in the U.S. market through a third-party affiliate, while shirking their obligations with respect to their substantial outstanding debts.  *See Matra Americas, LLC v. United States*, 681 F. Supp. 3d 1339, 1345–46 (Ct. Int'l Trade 2024). Coercive relief designed to encourage the defendants to comply with this Court's judgments and the customs laws, and to deter others from following the defendants' lead, is not only within the Court's authority to provide but is also essential to promoting the rule of law and the fairness of our markets.

## ARGUMENT

I.    **The Court Should Enter Default Judgment Against the Defendants Because They Refuse to Participate in Discovery Without Raising any Viable Objections**

Under USCIT Rule 37(d), the Court has the discretion to impose the sanction of default judgment on a defendant that refuses to participate in discovery.  USCIT Rule 37(d)(1)(A)(ii) and (3) (cross-referencing USCIT Rule 37(b)(2)(A)(i)-(vi), which permits the sanction of default judgment); *see Minnesota Min. & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1259–61 (Fed.

Cir. 1985) (applying Fed. R. Civ. P. 37). The Court need not compel a response before issuing default judgment as a sanction; where a defendant has "specifically stated" that it will not respond, the Court can safely assume that the defendant has "willfully defaulted." *Minnesota Min. & Mfg.*, 757 F.2d at 1260. Otherwise, USCIT Rule 37 "could be rendered virtually meaningless. A party could simply send its opponents a letter refusing to comply with a discovery request, confident that it would face no more serious sanction than a court order directing compliance." *Id.* That would be "plainly inconsistent with the purpose of Rule 37(d), *i.e.*, to allow the courts to" remedy "willful noncompliance with the" discovery rules "and to deter such conduct in the future." *Id.* (citing *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976) (per curiam); Fed. R. Civ. P. 1); *see United States v. Neman Bros. & Assocs.*, 18 C.I.T. 89, 91 (1994) (imposing default judgment for discovery violations where the defendants' conduct "indicate[d] a purposeful and skillful game of bluff and parry").

## A.    The Defendants Have Willfully Defaulted and Have Not Raised Any Meritorious Objection to Discovery Under Foreign Law

The defendants here have unequivocally expressed their willful default. In two letters, they stated that they "will not respond to" any of the Government's discovery requests and "will not participate in any future discovery in this case." Exs. 8 and 10. The defendants have even asked the Government to move for default judgment in lieu of pointlessly moving to compel. Ex. 10 at 2. This "total failure to respond" permits the Court to issue sanctions under USCIT Rule 37(d). *Minnesota Min. & Mfg.*, 757 F.2d at 1261.

Although this Court has not applied the factor tests that various circuits apply in determining whether default judgment is the appropriate sanction for discovery violations, *see, e.g.*, *United Constr. Prods., Inc. v. Tile Tech, Inc.*, 843 F.3d 1363, 1368 (Fed. Cir. 2016) (Ninth Circuit law); *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1301 (Fed. Cir. 2016) (Third

6

Circuit law), applying those tests would lead to the same result. These circuits generally ask whether the violation was willful, justified, or remediable through lesser sanctions. *See United Constr. Prods.*, 843 F.3d at 1368; *Drone Techs.*, 838 F.3d at 1301.

The defendants' refusal to participate in discovery is undisputedly willful and can only be remedied by imposing the sanction of default judgment. Lesser sanctions will not convince the defendants to "participate in [] future discovery in this case." Exs. 8 and 10. And although the defendants purport to raise objections based on foreign law, those objections fail to justify their refusal to respond for at least two reasons.

*First*, the defendants' foreign-law objections are not specific and accordingly have been waived. The USCIT Rules require a party to state its objections to discovery requests with specificity. USCIT Rules 33(b)(4) and 34(b)(2)(B). But the defendants' general references to the "German legal system," "German sovereignty," "German law," and GDPR, Ex. 8 at 1, do not explain "with specificity … how the information" the Government seeks through discovery "raises a specific conflict with foreign law." *See Fairfield Sentry Ltd. v. HSBC Securities Servs. (Luxembourg) S.A.*, 2022 WL 3910679, at *11 (S.D.N.Y. Aug. 31, 2022). Nor are the defendants' foreign-law objections tied to particular discovery requests. The defendants have therefore waived their objections. *See, e.g.*, *Rinaldi v. NICE*, 2020 WL 4340640, at *4 (S.D.N.Y. July 27, 2020) ("The Court rejects SAP's blanket general objections … and finds that SAP waived them because it did not make a specific objection(s) to any particular request(s)[.]").

*Second*, the defendants' foreign-law objections are meritless. A party cannot simply gesture toward foreign law to relieve itself from discovery in the United States. *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987). "[T]he party relying on foreign law has the burden of showing such law bars

production," and even then, a foreign statute "does not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *In re Mercedes-Benz Emissions Litig.*, 2020 WL 487288, at *6 (D.N.J. Jan. 30, 2020) (quotations omitted).

Foreign law does not absolve the defendants from participating in discovery in this case. The defendants' objections are purportedly based on German and European data-privacy laws, but those laws contain exceptions for litigation. *See, e.g.*, *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, 2020 WL 14025674, at *2 (S.D. Fla. June 3, 2020) (explaining that *Aérospatiale*'s "five-factor comity analysis" applies only where there is a conflict of laws). The German Federal Data Protection Act, for instance, does not apply to production of information "necessary … for the establishment, exercise or [defense] of legal claims," suggesting "that there is no conflict between the discovery obligations under" federal discovery rules "and any provision of the German" statute. *Knight Cap. Partners Corp. v. Henkel AG & Co.*, 290 F. Supp. 3d 681, 687–89 (E.D. Mich. 2017) (quoting the German Federal Data Protection Act). And Europe's GDPR likewise contains an "exemption" for information "necessary for the establishment, exercise or defense of legal claims." *Arigna Tech. Ltd. v. Nissan Motor Co., Ltd.*, 2022 WL 3020136, at *2 (E.D. Tex. July 29, 2022) (quoting Article 49(1)(e), *EU General Data Protection Regulation (GDPR)*: Regulation (EU) 2016/679, OJ 2016 L 119/1)). The defendants' "invocation of the GDPR" and German law "which allows for production of information in the context of discovery in civil litigation" thus "does not excuse" their refusal to respond to the Government's discovery requests. *Id.*

**B.    The Balance of Interests Weigh Decisively in Favor of Applying U.S. Law Over Foreign Law**

Because defendants have not raised any substantial objection under foreign law, there is no conflict with foreign law that requires the Court to conduct any further analysis. If there were a conflict, however, the Court would apply *Aérospatiale*'s five-factor balancing test to "weigh the interests of the United States and the party seeking discovery against the foreign state's interest in secrecy." *Id.* (quotation omitted). That test requires courts to weigh the (1) "importance" of the evidence, (2) "specificity" of the discovery requests, (3) location of the evidence, (4) existence of "alternative means" of obtaining the evidence, and (5) respective interests of the United States and the foreign state where the evidence is located (that is, comity). *Aérospatiale*, 482 U.S. at 544 n.28 (quotation omitted). Applying that test leads to the same result.

*Importance.* The information that the Government seeks—deal documents, financial records, facts bearing on successorship, and even information concerning the defendants' assets—is central to proving that the defendants engaged in a transaction for the purpose of evading their staggering debt. *See, e.g.*, *In re Mercedes-Benz Emissions Litig.*, 2020 WL 487288, at *6 (information is important where it "is directly relevant to the claims in the litigation" (quotation omitted)); *BrightEdge Techs., Inc. v. Searchmetrics, GmbH*, 2014 WL 3965062, at *3 (N.D. Cal. Aug. 13, 2014) (evidence concerning "a party's assets for purposes of enforcing a judgment is crucial and the importance weighs in favor of compelling disclosure" (quotation omitted)). The importance of the discovery weighs in the Government's favor.[1]

---

[1] This information is also important to the issue of personal jurisdiction. *See Koehler*, 776 F. Supp. 3d at 1239–44. That said, the Supreme Court recently held that "the Due Process Clause of the Fifth Amendment" is not coextensive with "the Fourteenth Amendment minimum contacts standard," and "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Fuld v. Palestine Liberation Org.*, 145 S. Ct. 2090, 2105 (2025). *Fuld* likely abrogates *Akro Corp. v. Luker*, 45 F.3d 1541 (Fed. Cir. 1995), which held that the "minimum-contacts framework applies to both the Fifth and Fourteenth Amendments." *Koehler*, 776 F. Supp. 3d at 1231 n.5.

*Specificity.*  By not raising any specific objections to the scope of the Government's discovery requests, the defendants have waived any objections they might have had.  *See Glock, Inc. v. United States*, 736 F. Supp. 3d 1279, 1296 (Ct. Int'l Trade 2024).  Regardless, the Government's 18 interrogatories, 46 requests for admission, and 14 requests for production "seek a discrete set of documents" and facts "tied directly to" the defendants' attempts to evade liability.  *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, 2020 WL 14025674, at *3.  The requests zeroed in on specific critical time periods immediately before and after the spin-off and particular actions undertaken by the defendants during that time.  Nor were the requests burdensome—most requests were for mere admissions seeking to narrow the scope of the case, and the remaining interrogatories and requests for production primarily asked the defendants to explain the spin-off and produce the records relating to it.  The specificity factor thus also weighs in the Government's favor.

*Alternatives.*  The defendants have not suggested (and the Government is not aware of) any means of "easily" obtaining the necessary information "elsewhere."  *In re Mercedes-Benz Emissions Litig.*, 2020 WL 487288, at *7 (quotation omitted) (explaining that the defendants failed "to propose any workable alternative").  Only the defendants, for example, possess documents revealing the objective of defendants' "spin-off."  The Government therefore lacks workable alternatives to discovery provided by the defendants.

*Comity.*  Where a plaintiff "is effectively being precluded from proceeding in the normal course of litigation, concerns about comity carry less weight."  *AnywhereCommerce, Inc. v. Ingenico, Inc.*, 2020 WL 5947735, at *3 (D. Mass. Aug. 31, 2020).  Moreover, the United States' interests are heightened where, as here, a case "concerns allegations of foreign companies" undermining laws Congress has enacted to protect our "free-enterprise system."  *In re Farm-*

*Raised Salmon & Salmon Prods. Antitrust Litig.*, 2020 WL 14025674, at *3 (quotation omitted). But even if this case involved regular duties rather than antidumping duties, the result would be the same. This Court necessarily resolves disputes on an international scale—parties and evidence are often found in foreign countries. Unless good-faith effort is made to comply with the USCIT Rules, this Court's effectiveness as a forum for resolving international-trade disputes would be compromised. So, even if there were a conflict with German law (which there is not), considerations of comity also weigh in the Government's favor.

*    *    *

The defendants' general objections based on foreign law are meritless. There is no conflict between the USCIT Rules and foreign law and, even if there were a conflict, the balance of interests weigh in favor of the United States. Because the defendants' objections fail, their refusal to participate in discovery amounts to willful default, which can only be remedied through the entry of default judgment. *Minnesota Min. & Mfg.*, 757 F.2d at 1260.

## II. The Defendants are Jointly and Severally Liable to the Government for the Unpaid Antidumping Duties, Plus Pre- and Post-Judgment Interest

"A defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint. The defaulting party's admission of liability for all well-pleaded facts, however, does not also function as an admission of damages. Thus, when considering a motion for default judgment, the court accepts as true all well-pleaded facts in the complaint, but must reach its own legal conclusions." *United States v. E.G. Plastics, Inc.*, 494 F. Supp. 3d 1361, 1363 (Ct. Int'l Trade 2021) (citations omitted). That the defendants have filed an answer does not change this standard. When a defendant defaults after answering, as is the case here, the Court may ignore the answer's denials by striking the answer "in whole or in part." USCIT Rule

11

37(b)(2)(A)(iii).[2]  Furthermore, courts also accept as true all deemed admissions stemming from a defendant's failure to respond to requests for admission.  *See, e.g.*, *Wright v. E-Systems, LLC*, 2016 WL 7802996, at *2–*3 (N.D. Tex. Dec. 20, 2016).

The amended complaint, the defendants' deemed admissions, and the Ingalls Declaration establish that the defendants are liable to the United States in the amount of $193,631,642.08, plus pre- and post-judgment interest.

## A.    Koehler Oberkirch GmbH and Koehler Paper SE are Both Liable for the $193,631,642.08 Debt

*Koehler Oberkirch GmbH.*  The defendants have already admitted that "Koehler Oberkirch GmbH is the mere continuation of, or successor-in-interest to, Papierfabrik August Koehler SE, which itself was the mere continuation of, or successor-in-interest to, Papierfabrik August Koehler AG."  Amended Compl. ¶ 8; Answer ¶ 8.  "Customs issued written bills to" Papierfabrik August Koehler SE "for payment due to Customs at the time of the" 1,462 entries' "liquidation or reliquidation."  Amended Compl. ¶ 23; Ingalls Decl. ¶ 22 & Att. H.  Those bills comprised "antidumping duties and pre-liquidation interest" in the total amount of "$193,631,642.08."  Amended Compl. ¶ 25; Ingalls Decl. ¶¶ 33–34 & Att. C.  No action was timely filed in this Court after Customs denied in part protests regarding the assessment of antidumping duties on the 1,462 entries.  Amended Compl. ¶ 27.  The $193,631,642.08 debt is thus final and conclusive under 19 U.S.C. § 1514(a).  Amended Compl. ¶ 28.  But Koehler Oberkirch GmbH has not paid.  Compl. ¶ 46; Ingalls Decl. ¶ 36.  Koehler Oberkirch GmbH is therefore liable to the Government in the amount of $193,631,642.08 in principal (antidumping duties and pre-liquidation interest under 19 U.S.C. § 1677g), plus post-liquidation interest (under

---

[2] Should the Court find it technically necessary to do so to enter default judgment against the defendants, the Government requests that the Court strike the defendants' answer.

19 U.S.C. § 1505(d)) accruing until the date of the default judgment, plus post-judgment interest accruing thereafter under 28 U.S.C. § 1961.  Amended Compl. ¶ 47; Ingalls Decl. ¶ 34 & Att. C; *United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1325–26 (Fed. Cir. 2013) (explaining that 28 U.S.C. § 1961 applies to this Court via 28 U.S.C. § 1585).

*Koehler Paper SE*.  Koehler Paper SE's liability is just as straightforward.  The Court has already found that Koehler Paper SE is judicially estopped from denying that it is Koehler Oberkirch GmbH's successor-in-interest.  *Koehler*, 776 F. Supp. at 1238–39.  That finding is sufficient to hold Koehler Paper SE liable to the Government to the same extent as Koehler Oberkirch GmbH—that is, for $193,631,642.08 in unpaid antidumping duties and pre-liquidation interest, plus post-liquidation interest under 19 U.S.C. § 1505(d) accruing until the date of the default judgment, plus post-judgment interest accruing thereafter under 28 U.S.C. § 1961.

Even without relying on judicial estoppel, the amended complaint and deemed admissions establish that Koehler Paper SE is liable for Koehler Oberkirch GmbH's debts as its successor-in-interest under fraud and mere-continuation theories, or as its alter ego.  *See United States v. Sterling Footwear, Inc.*, 279 F. Supp. 3d 1113, 1140 (Ct. Int'l Trade 2017); *Sys. Div., Inc. v. Teknek Elecs., Ltd.*, 253 F. App'x 31, 35–37 (Fed. Cir. 2007).  The amended complaint establishes that at the time of the self-described "spin-off"—which occurred within a year of the antidumping duty debt becoming final—there was continuity of management, physical location, substantially all assets (over 85 percent), goodwill, non-antidumping duty liabilities, and business operations (including control over Koehler Kehl GmbH) between Papierfabrik August Koehler SE (later known as Koehler Oberkirch GmbH) and Koehler Paper SE; the latter was effectively swapped in for the former in Koehler's corporate structure.  Amended Compl. ¶¶ 30–37, 39; Second Requests for Admission ¶¶ 15–19.  Papierfabrik August Koehler SE also ceased

13

its business by converting into Koehler Oberkirch, an undercapitalized remnant of its former self, shortly after the "spin-off." *Compare* Amended Compl. ¶ 5 *with id.* ¶ 29; *see id.* ¶¶ 36, 39, 42.

The deemed admissions provide further proof of successorship. The "spin-off was contemplated shortly after it became apparent that Papierfabrik August Koehler SE would be liable to Plaintiff for hundreds of millions of dollars in antidumping duties." Second Requests for Admission ¶ 26. The spin-off's purpose "was to avoid paying the $193,631,642.08 debt" owed and "was motivated by the intent to avoid paying" that debt. *Id.* ¶¶ 29–30. The spin-off thus amounted to a mere changing of hats, *United States v. Adaptive MicroSystems, LLC*, 914 F. Supp. 2d 1331, 1341 (Ct. Int'l Trade 2013): "all of Papierfabrik August Koehler SE's supply and service relationships were handled by Koehler Paper SE," "by the same contact people with the same contact information," before and after the spin-off. First Requests for Admission ¶¶ 3–4 (citing perma.cc/SF4H-E764). "Koehler Paper SE represented itself, to the general public, customers, and shareholders, as Papierfabrik August Koehler SE's continuation or successor after the spin-off," and Papierfabrik August Koehler SE "was converted into and renamed Koehler Oberkirch GmbH to make clear to" those same people that "Koehler Paper SE was the continuation of, and successor, to Papierfabrik August Koehler SE." Second Requests for Admission ¶¶ 20–21.

In short, Koehler Paper SE is liable for Koehler Oberkirch GmbH's debt, but has not yet paid. Amended Compl. ¶ 52; Ingalls Decl. ¶ 36. Koehler Paper SE is therefore liable to the Government in the amount of $193,631,642.08 in principal (antidumping duties and pre-liquidation interest under 19 U.S.C. § 1677g), plus post-liquidation interest (under 19 U.S.C. § 1505(d)) accruing until the date of the default judgment, plus post-judgment interest accruing thereafter under 28 U.S.C. § 1961. Amended Compl. ¶ 53; Ingalls Decl. ¶ 34 & Att. C.

**B.      The Defendants' Objections to the Debt are Meritless**

The defendants take issue with the Government's calculations, but their complaints are meritless.  For instance, they question "how the total alleged amount due has jumped from $193 million to $275 million over the period of a few months," Ex. 8 at 3, but the difference obviously is attributable to post-liquidation interest.  Ingalls Decl. ¶ 34 & Att. C; *see also* 19 U.S.C. § 1505(d).

The defendants also point to a supposed discrepancy of about $300,000 between the amount stated in paragraph 21 of the Ingalls Declaration and the total amount of the defendants' debt alleged in the complaint, *see* Ex. 8 at 2.  Setting aside the fact that the Government is seeking the *lesser* of these two amounts, so that if there had been an error, it would have clearly run in the defendants' favor, there is a straightforward explanation for the difference in the two amounts.  The amount listed in paragraph 21 of the declaration is "[t]he total increased or additional duties and pre-liquidation interest assessed at the time of the last liquidation or reliquidation of the 1,462 entries."  Ingalls Decl. ¶ 21.  That amount does not account for the four payments subsequently made by three surety companies that were applied first to interest accrued after liquidation or reliquidation, then to principal.  *Id.* ¶¶ 29–32.  The defendants' total liability, after accounting for the surety companies' payments, is accurately set forth both in the complaint and in the Ingalls Declaration.  *See id.* ¶ 34 & Att. C.

The defendants also complain that Customs' data and calculations could be inaccurate for a variety of reasons, *see* Ex. 8 at 2–3, but those data "accurately reflect certain records and information contained in ACE associated with" the 1,462 entries at issue.  Ingalls Decl. ¶ 6.  If the defendants wanted to contest the accuracy of that data, then they should have brought suit in this Court after their protests were denied.  They never did so, and thus their debt, as reflected in

Attachment C and the 1,462 bills in Attachment H to the Ingalls Declaration, is final and conclusive as a matter of law.  19 U.S.C. § 1514(a); *see United States v. Cherry Hill Textiles, Inc.*, 112 F.3d 1550, 1557–58 (Fed. Cir. 1997); *United States v. Am. Home Assurance Co.*, 857 F.3d 1329, 1336–37 (Fed. Cir. 2017).  Even if the amount of the debt were contestable despite § 1514(a) and *Cherry Hill*, the defendants' complaints about accuracy generally are not evidence that the data in this case is somehow inaccurate.  *See, e.g.*, *United States v. Pansier*, 2022 WL 2829759, at *2–*3 (7th Cir. July 20, 2022) (per curiam) ("The government's evidence—certified [tax] assessments … , a summary of interest computations, and an affidavit substantiating the damages calculation—amply support the [default] judgment. We presume that the government's evidence of tax liability … is correct.  Pansier submitted no evidence in the district court to rebut this presumption[.]" (citations omitted)).

Accordingly, the Court should enter default judgment against the defendants, jointly and severally, in the amount of $193,631,642.08 in unpaid antidumping duties and pre-liquidation interest under 19 U.S.C. § 1677g, plus post-liquidation interest under 19 U.S.C. § 1505(d) accruing until the date of the default judgment, plus post-judgment interest accruing thereafter under 28 U.S.C. § 1961.

**III.    The Court Should Enjoin the Defendants from Importing Merchandise into, or Exporting Merchandise from, the United States, or Causing Merchandise to be Imported or Exported by or on Behalf of a Third Party, Until they Pay the Antidumping Duties and Interest they Owe**

The defendants have made clear that they have no intention of satisfying any money judgment.  *See, e.g.*, Ex. 4, GOV001577 (emphasizing in financial statements that the Government's "claims are non-enforceable in Germany" and booking a fraction of the debt as a "provision" covering "the expected costs relating to" those claims).  In this rare circumstance— where the defendants' refusal to pay itself undermines this Court's judgments, the rule of law,

and the public interest in fair markets—an injunction is warranted to deprive the defendants of the benefit of their unfair trade practices in the U.S. market until they pay the antidumping duties and interest they owe.  The Court has the authority to enter such an injunction, as it is analogous to longstanding equitable remedies barring the entry of particular merchandise or divesting defendants from particular markets.  And under the facts of this case, only such an injunction would provide an adequate remedy and protect the United States from irreparable harm.

### A.    The Court Has the Authority to Enter the Government's Requested Injunction

The Court has the authority to issue an injunction barring the entry of the defendants' merchandise.  It has implied authority under the trade laws.  It also has authority to grant relief as an exercise of its traditional equitable powers.

*The Court's Statutory Authority.*  The Court has authority under the trade laws to issue the Government's requested injunction.  Congress might not have "specifically provide[d] for" the exclusion of merchandise as a remedy for a defendant's refusal to pay antidumping duties and interest or participate in discovery, "but considering the customs laws as a whole, it must have intended that such remedies would be available."  *United States v. Gold Mountain Coffee, Ltd.*, 597 F. Supp. 510, 515 & n.9 (Ct. Int'l Trade 1984) (reasoning that exclusion must be an available remedy in a 19 U.S.C. § 1592 case).  For example, under 19 U.S.C. § 1509, Customs has the authority to issue summonses to importers and exporters "for determining the liability of any person for … duties … which may be due the United States."  Federal district courts, under 19 U.S.C. § 1510, have the authority to enforce contempt sanctions against a person that fails to obey those summonses—sanctions that include "prohibit[ing] that person from importing merchandise into the customs territory of the United States …."

Congress "must have intended" for this Court to have equal authority to prohibit a defendant from bringing its merchandise into this country as a consequence of refusing to pay antidumping duties and interest or produce any records to the Government that would confirm their liability for those duties. *Gold Mountain Coffee*, 596 F. Supp. at 515 n.9 ("The court may fill such interstices in the law in accordance with Congressional intent."). Otherwise, it would create unusual incentives and diminish the Court's authority over litigation if the Government's requested injunction was an available remedy to enforce an administrative summons issued under 19 U.S.C. § 1509 to determine liability for duties, but was not an available remedy to enforce, at a minimum, discovery seeking the same information during litigation.

*The Court's Equitable Powers.* The Court also has authority to enter the Government's requested injunction as an exercise of equitable powers. *See* 28 U.S.C. § 1585 ("The Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States."); *id.* § 2643(c)(1) (this Court may, in addition to damages, "order any other form of relief that is appropriate in a civil action, including, but not limited to, … injunctions"). Under *Grupo Mexicano*, the equitable relief requested must be "sufficiently 'analogous' to the relief" available in equity "at the time of the founding." *Trump v. CASA, Inc.*, 606 U.S. 831, 841–42 (2025) (quoting *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999)). There are a wealth of examples of injunctions analogous to the one the Government requests that pass the *Grupo Mexicano* test.

Start with the long history—dating back at least to the 17th century—of the Court of Chancery enjoining the importation of particular merchandise. For instance, in various cases involving what are now called copyrights, the Court of Chancery enjoined the sale and importation of books. In one case, the Stationers' Company obtained "an Injunction against the

Defendant not to import or vend" "*English* Bibles and Statute-Books" that had been printed in Holland and "were now in the *Custom-house*," at least in part because it was "of great and publick Consequence for Strangers to print and vend in *England* our Statutes and Laws, if falsely done." *Company of Stationers*, 22 Eng. Rep. 862 (1682). The defendant went bankrupt and asked to be relieved from the injunction. *See id.* But the "Lord *Chancellor* declared they should be bound; and further ordered" that, as for books that "were in the Hands of the Customers,[3] the Customers should suffer none of them to be remov'd thence"—that is, that the books remain excluded from entry. *Id*; *see Company of Stationers Case*, 22 Eng. Rep. 854 (1681) (enjoining "Statute Books" printed in Amsterdam from leaving "the Custom-house").

These sorts of injunctions continued through the 18th century. H. Tomás Gómez-Arostegui, *What History Teaches Us About Copyright Injunctions and the Inadequate-Remedy-At-Law Requirement*, 81 S. Cal. L. Rev. 1197, 1241 & nn.227–28 (2008) (recounting an early 18th century case where the Court of Chancery permanently enjoined importation of an infringing work and "clarified that the books already seized by the customs house were to remain there indefinitely"). And bills in equity "almost universally asked for an injunction to restrain the defendant and his servants, workmen, and agents from … importing" infringing works. *Id.* at 1227.

Although these injunctions involved intellectual-property rights (like modern-day injunctions prohibiting the importation of merchandise that infringes a patent, trademark, or copyright), they nevertheless prohibited the entry of specified merchandise. That specific form of relief—the same relief the Government requests here—was thus familiar in equity jurisprudence "at the time of the founding." *CASA*, 606 U.S. at 842. And the test is not perfect

---

[3] A "customer" was "[a]n official who collects customs or dues; a custom-house officer." *Customer*, Oxford English Dictionary (2d ed. 1989).

symmetry, as *CASA* underscores. Just because the "English Court of Chancery could not enjoin the Crown or English officers," for instance, does not mean that federal courts lack the authority to enjoin the Government. *Id.* at 846 n.9 (quotation omitted). "[A]ntisuit injunction[s]" and "a long line of cases authorizing suits against state officials in certain circumstances" provide a sufficient analogy. *Id.* So too here: the long history of the Court of Chancery enjoining importation of particular merchandise, and even directing customs-houses to refuse entry, demonstrates that the Court has the authority to enter the Government's proposed injunction requesting precisely the same relief.

If that were not enough, consider injunctions excluding defendants from particular markets for their unfair trade practices. The Supreme Court has long upheld "equity's authority to use quite drastic measures to achieve freedom from the influence of the unlawful restraint of trade." *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 726 (1944). Divestiture orders are common in antitrust cases for remedying unfair competition and promoting fair markets. For instance, in *Ford Motor Co. v. United States*, a district court effectively cut Ford out of the spark-plug market by enjoining it from "manufacturing spark plugs" for 10 years, among other things. 405 U.S. 562, 572 (1972). The Supreme Court agreed that such divestiture was the appropriate remedy for Ford's anticompetitive conduct, as it would lower other firms' barriers to entry and give them a chance to compete. *Id.* at 575–78. The Government's requested injunction here is little more than a divestiture order against the defendants: leave the U.S. market until competitive conditions have been restored through payment of the outstanding antidumping duties and interest.

Reference to the equitable remedies available under the antitrust laws is particularly appropriate here as the antidumping laws were cut from the same cloth. In 1916, Congress

passed the nation's first antidumping law—which outlawed dumping goods "with the intent of destroying or injuring an industry in the United States, … or of restraining or monopolizing any part of trade or commerce in such articles in the United States"—because it "was concerned with eradicating practices of foreign producers that correspond to the kind of illegal activities which prompted the Sherman Act, *i.e.*, predatory price cutting."  James A. Kohn, *The Antidumping Act: Its Administration and Place in American Trade Policy*, 60 Mich. L. Rev. 407, 413 (1962) (quoting 15 U.S.C. § 72 (repealed 2004)).  Congress was in fact so concerned that, like with the antitrust laws, it provided for treble damages against violators, the purpose of which presumably was to provide injured parties "a greater incentive to bring derelicts to justice[.]"  *Brown v. Coates*, 253 F.2d 36, 40 & n.16 (D.C. Cir. 1958) (Burger, J.).

The Antidumping Act of 1921, from which modern antidumping law ultimately stems, "attack[ed] the problem differently," but only because of the 1916 Act's "unworkability" rather than any "divorcement of dumping and unfair monopoly practices in the congressional mind." Kohn, *The Antidumping Act*, 60 Mich. L. Rev. at 414.  Both Congress and the public were at the time concerned with "German dumping"—in particular, "the predatory tactics of the German dye industry" and the resulting harm to "domestic businesses" that were "forced to sell their entire output at a small margin of profit, or even at a loss."  *Id.* (quotation omitted).  In the 1921 Act, as with current antidumping law, Congress omitted the requirement of "predatory intent" and empowered the federal government to investigate and remedy dumping.  *Id.* at 414–16.

In short, the same concern for fair competition that animates antitrust laws also animates antidumping laws, calling for a similar suite of equitable remedies—even "quite drastic measures," *Bausch & Lomb*, 321 U.S. at 726—to level the playing field.  Divestiture in antitrust cases is analogous to prohibiting entry of a recalcitrant dumper's merchandise, as both prohibit a

21

defendant from reaping the benefits of its unfair trade practices to the detriment of competitors in the same market. To put the same point another way, if it is "absurd" to allow a monopolist to continue to possess and exercise the "power that it has acquired" unlawfully, *Ford*, 405 U.S. at 574 n.9 (quotation omitted), it is just as absurd to allow a firm that has dumped merchandise to continue participating in the U.S. market on what amount to unlawfully anticompetitive terms.

Accordingly, it is within the Court's general equitable powers to enjoin the entry of the defendants' merchandise.

**B.    In Light of the Defendants' Refusal to Pay its Massive Duty Liability, Undermining of the Antidumping Laws, and Flouting of this Court's Judgments, the Government's Requested Injunction is Warranted**

Finally, the Government's requested injunction is warranted in this case. "[O]nce the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *Ford*, 405 U.S. at 575 (quotation omitted). A plaintiff seeking a permanent injunction must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1083–84 (Fed. Cir. 2025) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Each factor weighs strongly in favor of the Government.

*Inadequate remedy at law.* The Government lacks an adequate legal remedy. A monetary judgment (which the Court should nevertheless order) is ultimately inadequate because the defendants "will simply refuse to pay any judgment[]." *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 262 (2d Cir. 2012). Indeed, the defendants have thus far refused to

pay, have refused to identify any assets in the U.S. sufficient to satisfy the judgment, and are protected from collection efforts in Germany under the "revenue rule." *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109–10 (2d Cir. 2001). They even engaged in a "spin-off" to try to further protect their assets. The defendants' "persistent efforts to frustrate the collection of money judgments … suffice to establish the inadequacy of a monetary relief[.]" *NML Capital*, 699 F.3d at 262; *see Motorola Credit Corp. v. Uzan*, 2003 WL 21373463, at *2 (S.D.N.Y. June 12, 2003) (Rakoff, J.) (explaining that a preliminary injunction was warranted in part because "the defendants' conduct throughout this litigation demonstrates that they will likely refuse to satisfy any judgment awarded in plaintiffs' favor").

*Irreparable harm.* For much the same reasons that the Government lacks an adequate remedy at law, the Government will also be irreparably harmed in the absence of the requested injunction. The inability of the Government to recover money from a party is an irreparable harm. *See, e.g.*, *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (Government faced irreparable harm where it would have to attempt to recoup funds from parties that "do not state that they will repay grant money if the Government ultimately prevails" and that currently "lack the resources to continue their" work); *see also State Farm Mut. Auto. Ins. Co. v. Am. Rehab & Physical Therapy, Inc.*, 376 F. App'x 182, 184 (3d Cir. 2010) (plaintiff "would face irreparable harm" absent an injunction because "[t]he record demonstrates that a money judgment alone is insufficient motivation" for the defendant, who "would continue to conceal assets" to "evade" collection efforts). So too is the defendant's continued disregard of this Court's judgments upholding the antidumping duties imposed on their predecessor and, by extension, of the antidumping laws themselves. Conduct like the defendants' that undermines the Government's efforts to "employ a duly enacted statute to help prevent" injuries to domestic

companies caused by dumping "constitutes irreparable harm." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (concluding that a court order enjoining enforcement of a state law caused the state irreparable harm).

*Public interest.*  The public interest also favors the Government.  "The public has an interest in the enforcement of judgments."  *State Farm*, 376 F. App'x at 184.  In this case, that interest extends both to this Court's judgments upholding the imposition of antidumping duties on the defendants' predecessor, and to a monetary judgment issued against the defendants for their outstanding antidumping duty liability.  The public interest is also furthered by an injunction that promotes the rule of law by deterring future nonpayment and evasion of antidumping duties and depriving the defendants of the benefits of their unfair trade practices. *See, e.g.*, *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980) ("Far more important than the interests of either the defendants or the existing industry … is the public's interest in enforcement of the antitrust laws and in the preservation of competition. The public interest is not easily outweighed by private interests.").

*Balance of hardships.*  Finally, the balance of hardships favors the Government, too.  The defendants, each of which are foreign entities, have no constitutionally protected interest in engaging in international trade.  *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015).  And whatever hardships the defendants would face from being excluded from the U.S. market pale in comparison to the continued harm that their refusal to pay antidumping duties, which are imposed and collected by the Government to preserve fair markets, has caused. *See, e.g.*, *United States v. Trib. Publ'g Co.*, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016) ("That the government enforces antitrust law on behalf of the public interest necessarily weighs heavily in the balance-of-hardships calculus."); *United States v. Ivaco, Inc.*, 704 F. Supp. 1409,

1430 (W.D. Mich. 1989) ("This private, financial harm must, however, yield to the public interest in maintaining effective competition."); *Columbia Pictures*, 507 F. Supp. at 434.

Furthermore, the proposed injunction is easily administrable by Customs, *see United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 333–34 (1961) ("We think the public is entitled to the surer, cleaner remedy of divestiture," "even if we were in doubt," over a more "cumbersome and time-consuming injunctive remedy" that would require the Government to "initiat[e] contempt proceedings[.]"), and complies with USCIT Rule 65(d)'s requirements. The injunction "describe[s] in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required," and binds only "the parties," "the parties' officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation with" any of the foregoing who have received "actual notice" of the order. USCIT Rule 65(d).[4]

*        *        *

In sum, an injunction barring the defendants' merchandise from the U.S. market until they pay the antidumping duties and interest that they owe is warranted. Their continuing refusal

---

[4] To be clear, once Customs provides actual notice of the injunction to the importing community, the injunction would prohibit *any* importer from entering the defendants' goods. Goods necessarily are brought into this country by parties acting in concert, and in contractual privity, with a foreign supplier. The defendants cannot evade the injunction by relying on such third parties. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) (explaining that the purpose of Fed. R. Civ. P. 65(d) is to "bind[]" third parties "identified with" the enjoined parties "in interest" or "in 'privity' with them" and to prevent enjoined parties from "nullify[ing] a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding"). And these third parties would include all would-be importers of the defendants' goods: not only Matra Americas, the defendants' affiliate, but also the approximately 30 different importers that have imported of the defendants' merchandise in 2025, according to Customs' records.

to pay has irreparably harmed the Government, rendered legal remedies inadequate, injured the public interest, and tipped the balance of harms in the Government's favor.

## CONCLUSION

For these reasons, the Court should grant the Government's motion for default judgment, enter judgment in the Government's favor and against the defendants, and enjoin the defendants from directly or indirectly through third parties importing, or causing to be imported, merchandise into the United States, until they pay what they owe.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

Of Counsel:                          /s/ Edward F. Kenny
BRANDON T. ROGERS                    EDWARD F. KENNY
LISA ROSS                            Trial Attorney
ALEXANDRA KHREBTUKOVA                Department of Justice, Civil Division
U.S. Customs and Border Protection   Commercial Litigation Branch
Office of Chief Counsel              26 Federal Plaza, Suite 346
                                     New York, New York 10278
                                     Tel.: (212) 264-9236 or 9230
Dated: February 9, 2026              *Attorneys for Plaintiff*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: GARY S. KATZMANN, JUDGE

_____
|                                           :
UNITED STATES,                              :
|                                           :
|                    Plaintiff,             :
|                                           :
|                    v.                     :
|                                           :        Court No. 24-00014
KOEHLER OBERKIRCH GMBH, f/k/a               :
PAPIERFABRIK AUGUST KOEHLER                 :
SE, f/k/a PAPIERFABRIK AUGUST              :
KOEHLER AG; and KOEHLER PAPER               :
SE,                                         :
|                                           :
|                    Defendants.            :
_____:

## CERTIFICATE OF COMPLIANCE

I, Edward F. Kenny, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the Government's memorandum in support of its motion for default judgment, dated February 9, 2026, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, as amended by this Court's order, dated January 29, 2026, and contains  7,933 words.

/s/ Edward F Kenny
EDWARD F. KENNY