UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| UNITED STATES,<br><br>   Plaintiff,<br><br>   v.<br><br>KOEHLER OBERKIRCH GMBH, f/k/a PAPIERFABRIK AUGUST KOEHLER SE, f/k/a PAPIERFABRIK AUGUST KOEHLER AG; and KOEHLER PAPER SE,<br><br>   Defendants. | Court No. 24-00014 |

# BRIEF OF *AMICI CURIAE*
# DOMTAR CORPORATION AND APPVION, LLC

Stephen J. Orava
Daniel L. Schneiderman
Joseph Grossman-Trawick

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500

*Counsel For Amici Curiae*

March 6, 2026

**TABLE OF CONTENTS**

I. INTEREST OF *AMICI CURIAE* ................................................................................ 1

II. INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 2

III. THE REQUESTED INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST BY ENFORCING THE TRADE REMEDY LAWS AND REDRESSING HARM TO *AMICI* ........................................................................................................................ 3

IV. CONCLUSION............................................................................................................ 7

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*APEX Exports v. United States,*
  777 F.3d 1373 (Fed. Cir 2015) ................................................................................. 4

*Domtar Corp. v. United States,*
  803 F. Supp. 3d 1345 (Ct. Int'l Trade 2025) ..................................................... 2, 5, 6

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) ................................................................................................. 6

*Matra Ams., LLC v. United States,*
  681 F. Supp. 3d 1339 (Ct. Int'l Trade 2024) ........................................................... 2

*Matra Ams., LLC v. United States,*
  Slip Op. 25-145 (Ct. Int'l Trade Nov. 20, 2025) ..................................................... 2

*Papierfabrik August Koehler AG v. United States,*
  139 S. Ct. 1290 (2019) ......................................................................................... 1, 4

*Papierfabrik August Koehler AG v. United States,*
  180 F. Supp. 3d 1211 (Ct. Int'l Trade 2016) ....................................................... 1, 4

*Papierfabrik August Koehler AG v. United States,*
  710 Fed. Appx. 889 (Fed. Cir. 2018) ................................................................... 1, 4

*Papierfabrik August Koehler SE v. United States,*
  138 S. Ct. 555 (2017) ........................................................................................... 1, 4

*Papierfabrik August Koehler S.E. v. United States,*
  7 F.Supp.3d 1304 (Ct. Int'l Trade 2014) ................................................................. 1

*Papierfabrik August Koehler SE v. United States,*
  843 F.3d 1373 (Fed. Cir. 2016) ........................................................................... 1, 4

**Other Authorities**

*Antidumping Duty Orders: Lightweight Thermal Paper from Germany
  and the People's Republic of China,* 73 Fed. Reg. 70,959 (Dep't
  Commerce Nov. 24, 2008) .................................................................................. 1, 3

*Thermal Paper From the Federal Republic of Germany: Final Results of Antidumping Duty Administrative Review; 2021–2022,* 89 Fed. Reg. 47517 (Dep't Commerce June 3, 2024) ................................................................. 5

*Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Antidumping Duty Orders*, 86 Fed. Reg. 66,284 (Dep't Commerce Nov. 22, 2021) ............................................................................... 2, 3

I.      INTEREST OF *AMICI CURIAE*

*Amici curiae* Domtar Corporation ("Domtar") and Appvion, LLC ("Appvion") are domestic thermal paper producers.  In 2007, Appleton Papers Inc. ("Appleton"), the predecessor to Appvion and to the thermal papermaking assets of Domtar, petitioned the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("ITC") for the antidumping duty ("AD") order on lightweight thermal paper from Germany from which Defendants' antidumping duty liability arose.  *See Antidumping Duty Orders: Lightweight Thermal Paper from Germany and the People's Republic of China*, 73 Fed. Reg. 70,959 (Dep't Commerce Nov. 24, 2008).  Appleton (and then Appvion) also actively participated before Commerce in the second and third administrative reviews of that order, which were the specific segments giving rise to the AD liability now at issue, as well as before the courts in all subsequent litigation that ultimately upheld the AD margins assigned to Koehler.  *See Papierfabrik August Koehler AG v. United States*, 180 F. Supp. 3d 1211 (Ct. Int'l Trade 2016) (upholding Koehler's antidumping rate in the second administrative review), *aff'd* at 710 Fed. Appx. 889 (Fed. Cir. 2018), *cert denied*, 139 S. Ct. 1290 (2019);  *see also Papierfabrik August Koehler S.E. v. United States*, 7 F.Supp.3d 1304 (Ct. Int'l Trade 2014) and *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016) (upholding Koehler's antidumping rate in the third administrative review), *cert denied*, 138 S. Ct. 555 (2017).  Because *amici* invested substantial resources in the underlying determinations giving rise to Koehler's

1

antidumping liabilities, they also have an interest in seeing those duties collected.

Following revocation of the 2008 order during the first sunset review, *amici* were reinjured by unfairly traded thermal paper from Germany and successfully petitioned for a second order that was imposed in 2021. *See Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Antidumping Duty Orders*, 86 Fed. Reg. 66,284 (Dep't Commerce Nov. 22, 2021). As this Court is aware, the *amici* have actively participated in related administrative proceedings and ensuing appeals involving the Defendants and the unpaid duty liability. Indeed, the same unpaid antidumping duties at issue in this case also were the subject of methodological arguments advanced by *amici* in those related proceedings involving the second order. *See Matra Ams., LLC v. United States,* 681 F. Supp. 3d 1339, 1380-81 (Ct. Int'l Trade 2024); *Domtar Corp. v. United States*, 803 F. Supp. 3d 1345 (Ct. Int'l Trade 2025) ("*Domtar*"); *Matra Ams., LLC v. United States*, Slip Op. 25-145 (Ct. Int'l Trade Nov. 20, 2025). Accordingly, the *amici* bring a unique and relevant perspective on this case.

## II.   INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents a straightforward question: whether a foreign company can engage in unfair trade practices, accrue more than $200 million in AD liabilities, take active steps to avoid payment of that debt – and yet still maintain unfettered access to the U.S. export market? The answer must be no.

The public interest clearly would be served by granting the government's requested injunction against the continued importation of Koehler's thermal

paper until the debt has been paid in full. Absent such relief, Koehler effectively would have no incentive to comply with the judgment. Moreover, Koehler's behavior has undermined the effectiveness of trade remedy laws designed to protect *amici*, and the requested injunctive relief would help redress the resulting harm to the domestic industry. The Court should grant the Government's Motion for Default Judgment and order the requested injunction.

### III. THE REQUESTED INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST BY ENFORCING THE TRADE REMEDY LAWS AND REDRESSING HARM TO *AMICI*

The domestic thermal paper industry has been materially injured, repeatedly, by unfairly traded imports of German thermal paper produced by Koehler, leading to the imposition of AD orders in 2008 and again in 2021. *See Antidumping Duty Orders: Lightweight Thermal Paper from Germany and the People's Republic of China*, 73 Fed. Reg. 70,959 (Dep't Commerce Nov. 24, 2008); *Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Antidumping Duty Orders*, 86 Fed. Reg. 66,284 (Dep't Commerce Nov. 22, 2021). These AD orders are remedial in nature; they are intended to provide relief to injured domestic producers by enforcing pricing discipline: exporters generally must adjust their prices to eliminate dumping, or else they and their importers will accrue substantial antidumping duty liabilities. This system breaks down, however, when the exporter (also acting as its own importer) has no intention of ever paying the duties and is not required to pay the duties to continue participating in trade. Such an exporter, knowing it will not pay (or will not have

3

to pay), lacks any incentive to modify its injurious dumping practices.  The actual *collection* of antidumping duties, therefore, is integral to providing relief and effectuating the market-disciplining effect of an AD order.  *See, e.g.*, *APEX Exports v. United States*, 777 F.3d 1373 at 1379-80 (Fed. Cir 2015).

Koehler's conduct exemplifies the most egregious abuse of this system.  During the second and third administrative reviews of the 2008 order, rather than adjust its prices to non-dumped levels as the law contemplates, Koehler attempted to eliminate its margin through fraud.  *See Papierfabrik August Koehler AG*, 180 F. Supp. 3d 1211, 1221 (upholding use of adverse inferences to address Koehler's "fraudulent conduct" in the second administrative review), *aff'd at* 710 Fed. Appx. 889 (Fed. Cir. 2018), *cert denied*, 139 S. Ct. 1290 (2019); *see also Papierfabrik August Koehler SE*, 843 F.3d 1373, 1383 (upholding adverse inferences to address Koehler "fraudulent sales data" in the third administrative review), *cert denied*, 138 S. Ct. 555 (2017).  When this fraud was discovered and substantial antidumping duties were subsequently assessed, Koehler refused to pay.  The result: *amici* have been forced to compete against an exporter that presently enjoys all the benefits of access to the U.S. market while bearing none of the costs of its unfair trade practices.  This has directly harmed *amici's* competitive position and ability to sustain domestic manufacturing operations and the American jobs they support.

The harm to *amici* extends beyond unfair competition in the marketplace.  *Amici* and their predecessor have incurred millions of dollars in legal expenses –

not only in petitioning for the AD orders but also in litigating Koehler's liability over the course of nearly ten years. Although the entries giving rise to Koehler's liability were made during just two administrative reviews covering 2009-2011, Koehler aggressively litigated and appealed both reviews to the maximum extent possible, with the Supreme Court's final denial of *certiorari* not occurring until 2019. If, after this protracted legal battle, Koehler is permitted to avoid its debt yet maintain unfettered access to the U.S. market, *amici's* substantial investments in enforcing U.S. trade laws will have been rendered meaningless. Such an outcome would signal to other foreign exporters that they too can dump goods into the U.S. market, engage in fraud to conceal it, and simply refuse to pay when caught – all without meaningful consequence.

*Amici* sought to address the problem, at least in part, by requesting that Commerce, when calculating Koehler's dumping margins under the existing 2021 order, capture the interest accruing each year on Koehler's unpaid debt as a U.S. price adjustment. *See Thermal Paper From the Federal Republic of Germany: Final Results of Antidumping Duty Administrative Review; 2021–2022,* 89 Fed. Reg. 47517 (Dep't Commerce June 3, 2024); *see also Domtar*, 803 F. Supp. 3d 1345 at 1356. Commerce and this Court, however, interpreted the antidumping statute as precluding such an adjustment. *Id.* As this Court explained:

> Domtar suggests that "Koehler should not be permitted to maintain virtually duty-free access to the U.S. thermal paper market, as would be enabled by the insignificant margin calculated in the Final Results, without paying final assessments on past thermal paper entries." Pl.'s Br. at 10. According to Domtar, categorizing the interest as an indirect selling expense would generate a higher

5

> dumping margin on Koehler's current exports and thus would "create an incentive for Koehler to . . . ultimately resolve its outstanding debt." Pl.'s Br. at 11. It is not within the province of the court to consider the policy implications of this ruling on Koehler's actions. While it may be that incentivizing parties to timely pay antidumping duties is a respectable goal, such a policy objective cannot overcome statutory text and precedent.

*Domtar*, 803 F. Supp. 3d at 1356. Consequently, this Court upheld Koehler's low AD cash deposit rate of 0.76 percent calculated in the underlying review.

In *Domtar*, this Court found that it was constrained by the text of the antidumping statute, which could not be overcome by policy objectives – even if incentivizing Koehler to pay its duties is a "respectable goal." *Id.* Here, no such constraint applies, and this Court is specifically directed to consider the public interest when evaluating injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The public interest is clear: if foreign companies can accrue hundreds of millions of dollars in AD liabilities, actively evade payment, and yet suffer no restriction on their continued access to the U.S. market, the trade remedy laws become a dead letter. Injured domestic industries would have no meaningful recourse, and the deterrent effect of antidumping orders would be eviscerated. The requested injunction is therefore necessary to vindicate the purposes underlying the trade remedy laws, to promote fair trade, and to ensure that injured domestic producers receive the relief to which they are entitled.

The practical benefits of the requested injunction reinforce this conclusion. First, it would create a meaningful incentive for Koehler to satisfy its judgment debt (and, given the overseas locations of Koehler's assets, it is likely the only

6

remaining leverage available to the government).  Second, even if Koehler persists in its refusal to pay, an injunction will provide direct relief to the domestic industry and restore fairness by removing from the market a competitor that has demonstrated, through years of fraud and nonpayment, that it will not play by the rules.  Granting the injunction would restore fairness to the competitive landscape and reaffirm that compliance with U.S. trade laws is not optional.

## IV.   CONCLUSION

Defendants' continued failure to pay more than $200 million in AD liability undermines the effectiveness of the trade remedy laws and erodes confidence in the system's ability to provide meaningful relief.  *Amici* respectfully urge the Court to grant the Government's Motion for Default Judgment and order the requested injunctive relief.

Respectfully submitted,

*/s/ Stephen J. Orava*
Stephen J. Orava
SOrava@kslaw.com

Daniel L. Schneiderman
DSchneiderman@kslaw.com

Joseph Grossman-Trawick
JGrossman-Trawick@kslaw.com

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500

*Counsel For Amici Curiae*

March 6, 2026

7

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| UNITED STATES, <br><br> Plaintiff, <br><br> v. <br><br> KOEHLER OBERKIRCH GMBH, f/k/a PAPIERFABRIK AUGUST KOEHLER SE, f/k/a PAPIERFABRIK AUGUST KOEHLER AG; and KOEHLER PAPER SE, <br><br> Defendants. | Court No. 24-00014 |

**CERTIFICATE OF COMPLIANCE**
**WITH WORD COUNT LIMITATIONS**

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's Standard Chambers Procedures, the undersigned certifies that this brief complies with applicable word count limitations. Exclusive of the exempted portions, as provided in paragraph 2(B)(1), this brief includes 1,726 words. In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare the submission.

*/s/ Daniel Schneiderman*
Daniel L. Schneiderman

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 737-0500

*Counsel For Amici Curiae*

March 6, 2026